**Brenda DICKENSON, et al.,
Plaintiffs, Appellants,**

v.

**Michael PETIT, et al., Defendants,
Appellees.**

**No. 82–1315.**

United States Court of Appeals,
First Circuit.

Argued Sept. 17, 1982.

Decided Nov. 1, 1982.

---

Robert E. Mittel, Portland, Me., with whom Sewall, Mittel & Heffernan, Kathleen C. Caldwell, Solomon S. Goldman, and Hugh H. Calkins, Portland, Me., were on brief, for plaintiffs, appellants.

Katherine Greason, Asst. Atty. Gen., Dept. of Human Services, Augusta, Me., with whom James Eastman Smith, Asst. Atty. Gen., Dept. of Human Services, and William C. Nugent, Asst. Atty. Gen., Civil Division, Augusta, Me., were on brief, for defendant, appellee Michael Petit.

Joyce Elise McCourt, Asst. Regional Atty., Dept. of Health and Human Services, Washington, D.C., with whom Richard S. Cohen, U.S. Atty., Portland, Me., and William H. Browder, Jr., Asst. U.S. Atty., Bangor, Me., were on brief, for defendant, appellee Richard S. Schweiker.

Before DAVIS\*, CAMPBELL and BREYER, Circuit Judges.

\* Of the Federal Circuit, sitting by designation.

BREYER, Circuit Judge.

Plaintiffs represent a limited class of Maine recipients of Aid to Families with Dependent Children ("AFDC"). *See* 42 U.S.C.A. §§ 601–676 (West 1974 & Supp. 1975–1981). Maine, in calculating the size of their grants, no longer gave them the advantage of an "Earned Income Disregard" ("EID") after February 1, 1982. Plaintiffs sought declaratory and injunctive relief from the federal district court requiring Maine to use the EID for several additional months. The court refused to grant a preliminary injunction, and plaintiffs appealed. To prevail here they must show that the decision below constituted "an abuse of discretion" or that it was "the clear result of an error of law." *Fifteen Thousand Eight Hundred and Forty-four Welfare Recipients v. King,* 610 F.2d 32, 34 (1st Cir. 1979); *see Massachusetts Association for Retarded Citizens, Inc. v. King,* 668 F.2d 602 (1st Cir. 1981). They have not done so.

We have recently considered at length the very statute at issue: the AFDC provisions related to the EID codified at 42 U.S.C.A. § 602(a)(8)(A)(iv) (West Supp. 1975–1981). *See Drysdale v. Spirito,* 689 F.2d 252 (1st Cir. 1982). We shall not repeat that discussion, but we refer the interested reader to that opinion for background. We shall here summarize the basic workings of the statutory scheme.

Essentially, AFDC is administered by states under requirements laid down by federal law. One of those requirements is that the states provide an EID—that they subtract a sum of money from the earned income of an AFDC recipient when calculating the size of that recipient's grant. The purpose of the EID is simply to encourage those on welfare to work; without it many AFDC recipients found that their extra dollars of earned income were offset by the reductions in the AFDC grant.

Prior to 1981 the states calculated a recipient's EID roughly as follows: First, the state would determine whether the individual would qualify for AFDC in the absence of the EID. Second, the state would subtract from the recipient's earned income the EID, which amounted to $30 plus one-third of that income. Third, the state would further subtract from the income the recipient's work-related and child-care expenses. The amount left after these deductions was the income that "counted" for purposes of determining the size of the AFDC grant. Thus, assume a state's standard of need was $550 per month for a family of four and that the "caretaker parent" earned $420 per month. In this simplified example, the state would begin with $420 earned income, subtract $30 and further subtract one-third of the remaining $390, leaving "countable" income of $260. The state would then go further. If the recipient was spending $170 on child care, it would subtract that amount from $260, leaving $90. And, if the recipient spent $80 on uniforms, carfare, and other work-related expense, it would also subtract that amount, leaving $10. This final sum of $10 was subtracted from the state's standard of need. If that standard were $550, the grant was thus $540. The first of these deductions, the EID, was governed by 42 U.S.C. § 602(a)(8)(A)(ii) (1976), and we shall refer to it as the "(A)(ii) EID." The other deductions were considered to be work expenses under 42 U.S.C. § 602(a)(7) (1976).

In 1981 Congress in the Omnibus Budget Reconciliation Act ("OBRA"), Pub.L. No. 97–35, 95 Stat. 357 (1981), amended this statute to reduce the size of the AFDC grant. For our purposes, we must focus on three specific changes made in respect to calculation of the EID and work-expense allowances. First, the OBRA replaced the "work expense" deduction provisions with a standard $75 deduction and an allowance for child care expenses of no more than $160. Second, it said that the child care and work expense allowances would be subtracted before, not after, the EID. Thus, in our example the state would first subtract $75 and then $160 from the recipient's $420 earned income, leaving $185. It would then apply the EID, subtracting $30 plus one-third of the remainder—leaving about $103 to subtract from the need standard of $550.

The result, in our example, is a grant of $447 (compared with $540 under the previous statute.) Third, and most important, Congress said recipients could take advantage of the EID for no more than four months.

The issue in this case concerns only the question of when the changes enacted in the OBRA should take effect. In fact, when Congress enacted the amendments in mid-1981, it specifically stated that they would "become effective on October 1, 1981." Pub.L. No. 97–35, 95 Stat. 356, 859 (1981). Congress also created an exception to the effective date:

> If a State agency administering [an AFDC] plan ... demonstrates, to the satisfaction of the Secretary of Health and Human Services, that it cannot, by reason of State law, comply with the requirements of an amendment ... the Secretary may prescribe that ... the amendment will become effective [one month after the State's legislative session] ....

*Id.* at 860. Maine evidently had some difficulty complying, but it did bring its state plan into compliance by January 1, 1982. All parties concede that the "exception" just quoted does not apply to Maine. Thus, since Maine applied the four-month "cut-off" for the first time on February 1, 1982, four months *after* the statute's effective date of October 1, 1982, one might wonder what argument plaintiffs can make for a still longer postponement.

Plaintiffs, in fact, have developed an argument that turns on the literal wording of the "cut-off" provision. That provision states that "subparagraph (A)(iv)" shall not apply to "the earned income of a person with respect to whom *subparagraph (A)(iv)* has been applied for four consecutive months." 46 U.S.C.A. § 602(a)(8)(B)(ii) (West Supp. 1975–1981) (emphasis added). Subparagraph (A)(iv) contains the EID provision only in the *new* version as amended in 1981. The former provision of the EID, as noted above, was contained in subparagraph (A)(ii). Moreover, as we have already explained, the "new" EID is calculat-

ed somewhat differently from (and is less generous than) the "old" EID. Therefore, say plaintiffs, Maine should cut off a recipient's EID only after the recipient has received the "*new* (A)(iv)" EID for four months. Since Maine did not put the "new" EID into effect until January, Maine cannot cut off recipients until four more months have elapsed.

■ But a clever and literal reading of a statute may go directly counter to everything Congress intended. As Judge Learned Hand explained in *Helvering v. Gregory,* 69 F.2d 809, 810–11 (2d Cir. 1934), *aff'd,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), a statute may not apply "even though the facts answer the dictionary definitions of each term used in the statutory definition.... [For] the meaning of a sentence may be more than that of the separate words, as a melody is more than the notes, and no degree of particularity can ever obviate recourse to the setting in which all appear, and which all collectively create."

■ The setting here includes a statute that explicitly states that it shall take effect on October 1, 1981. One natural reading of this language is that all recipients who have received an EID for four months as of October 1 would lose that disregard immediately. That is to say, the reference in subparagraph (B)(ii) to the (A)(iv) disregard most naturally refers to the EID itself —"old" and "new" alike. The Department of Health and Human Services ("HHS") might nonetheless have implied authority to postpone where necessary this effective date briefly, as it did in fact do. *See* 47 Fed.Reg. 5662 (1982); 46 Fed.Reg. 46758 (1981). Alternatively, the "cut-off" language can be read to refer to all those who were *supposed* to get the "new (A)(iv)" EID, including those who (by mistake or for administrative reasons) received the "old (A)(ii)" EID instead. Indeed, (except possibly for very unusual instances) anyone who received an AFDC check reflecting an "old" EID calculation received more money than he would have received under the "new" EID calculation. In a sense, then, he re-

ceived the benefit of the "new" EID and more. The language, in other words, need not be read as plaintiffs suggest.

The setting here also includes a legislative history that demonstrates a congressional intent to begin saving money as soon as possible by disbursing benefits only to the most destitute. *Cf. Philadelphia Citizens in Action v. Schweiker,* 669 F.2d 877, 883–85 (3d Cir. 1982); *Wells v. Schweiker,* 536 F.Supp. 1314, 1319, 1326 (E.D.La.1982); H.R.Rep. No. 97–209, 97th Cong., 1st Sess. 979, —— (1982), *reprinted in* 127 Cong.Rec. H5433, H5714 (daily ed. July 29, 1981) (reduction in AFDC program costs). HHS calculated that the statutory changes would over the next five years save the federal government $6 billion and state and local governments $5 billion, *see* 46 Fed.Reg. 46751 (1981), and that the "prompt implementation" of the amendments would itself save $2 billion, *see* 46 Fed.Reg. 46750 (1981). The Department did not specifically determine what would happen if a state did not, as Congress mandated, begin its EID recalculations on October 1, but a state that delayed further (without the authorization of HHS) would clearly be acting contrary to Congress' expressed intent.

Finally, the only plausible purpose underlying a deadline postponement—the need to provide time for continuing AFDC recipients to adjust to the new situation by allowing them to receive the EID for a longer time before cutting it off entirely—has been satisfied. *Cf.* Fed.Reg. 5662 (1982); 46 Fed.Reg. 46758 (1981). Plaintiffs received a four-month period of adjustment. The legislative history is silent on this issue, but even if Congress did intend to grant continuing recipients a buffer period, the plaintiffs received the typically more generous "old" EID from October 1, 1981, the statute's effective date, until Maine's new plan went into effect. Moreover, Maine has evidently taken advantage of the interim period to change its method for calculating AFDC payments, making them significantly larger to the point where the increase may offset the lost EID. *See* Letter from Paul A. LeVecque of Department of Human Services, Augusta, Maine, to Joseph P.

Mirabella of HHS, Boston, Massachusetts (Nov. 30, 1981); Brief for Appellees at 4 n. 3. We can, in these circumstances, find no congressional purpose plausibly underlying OBRA that would warrant a still further extension of the cut-off date. Indeed, plaintiffs' interpretation of the statute would require us to suggest that whenever, through mistake, litigation, noncompliance or any other reason, AFDC recipients manage to keep the more generously calculated EID, Congress intended to give them yet an *additional* four months of the revised EID. Such a result does not promote, but rather conflicts with, the purposes that appear to underlie the statute.

We also note that HHS has consistently argued that the "cut-off" cannot be postponed beyond February 1. *See* Letter from Linda S. McMahon of HHS, Washington, D.C., to Bernard Stumbras of Division of Economic Assistance, Madison, Wisconsin (Feb. 1, 1982). We must respect HHS's interpretation of its own governing statute, particularly where the legal issue is minor and interstitial. *See Quern v. Mandley,* 436 U.S. 725, 738, 98 S.Ct. 2068, 2076, 56 L.Ed.2d 658 (1978); *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); *Constance v. Secretary of Health and Human Services,* 672 F.2d 990, 996 (1st Cir. 1982); *see also Red Lion Broadcasting Co. v. Federal Communications Commission,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Philadelphia Citizens in Action v. Schweiker, supra,* 669 F.2d at 886. The Department's familiarity with the administrative and humane considerations involved in bringing the new statute into effect entitle it to a court's consideration when it interprets the "effective date" provision generously to allow application of the EID for an additional four months after October 1 to those already receiving it. The Department is entitled to similar respect when it determines that still further postponement of the cut-off is not warranted.

Essentially, then, the plaintiffs' argument is linguistic. In the face of hostile legislative history and administrative interpretation, they are unable to muster convincing

policy reasons in support of their interpretation, and the statute's language does not resolve the issue. *Cf. Ciampa v. Secretary of Health and Human Services,* 687 F.2d 518 (1st Cir. 1982).

We also note that on this analysis many of the cases cited by plaintiffs are beside the point. *See Townsend v. Swank,* 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); *New Jersey v. Department of Health and Human Services,* 670 F.2d 1284 (3d Cir. 1982). Plaintiffs construe these cases to mean that federal AFDC law does not govern if contradicted by a state "implementation plan," and argue that the state cannot consider the four-month EID period to have begun during the time that the plaintiffs received the "old EID" prior to the effective date of the revised plan. Even if it is true that federal AFDC law does not control if contradicted by a state plan, this case concerns the application of the cut-off *after* January 1—after the state plan implementing the new federal law took effect. We see no reason why HHS and the Maine welfare department cannot consider, for the purpose of calculating the four-month cut-off period, a recipient's EID period to have begun prior to this date.

■ For these reasons, we believe that the district court did not abuse its discretion when it determined that the plaintiffs were not likely to win on the merits. And, its refusal to issue a preliminary injunction is

*Affirmed.*