USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-2369 ELLEN BROWN, ET AL., Plaintiffs, Appellees, v. SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Martin F. Loughlin, Senior U.S. District Judge] __________________________ ____________________ Before Breyer,* Chief Judge, ___________ Campbell, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ ____________________ Christine N. Kohl, Attorney, Appellate Staff, Civil Division, ___________________ U.S. Department of Justice, with whom Frank W. Hunger, Assistant ________________ Attorney General, Paul M. Gagnon, United States Attorney, and Barbara ______________ _______ C. Biddle, Attorney, Appellate Staff, Civil Division, U.S. Department _________ of Justice, were on brief for appellant. Victoria Pulos with whom Deborah Schachter and New Hampshire _______________ _________________ ______________ Legal Assistance were on brief for appellees. ________________ ____________________ January 17, 1995 ____________________  ____________________ *Chief Judge Breyer heard oral argument in this matter, but did not participate in the drafting or the issuance of the panel's opinion. The remaining two panelists therefore issue this opinion pursuant to 28 U.S.C. 46(d). CAMPBELL, Senior Circuit Judge. This is a class _____________________ action challenging as arbitrary and capricious an Aid to Families With Dependent Children ("AFDC") regulation promulgated by the Secretary of Health and Human Services ("HHS") in 1982. The regulation, called the "automobile resource exemption," limits to $1,500 the equity value of the automobile a family may own before the automobile's equity value affects the family's qualification to receive AFDC benefits. 45 C.F.R. 233.20(a)(3)(i)(B)(2) (1993). The district court denied defendant's motion for summary judgment and granted plaintiffs' motion for summary judgment, striking down the regulation as arbitrary and capricious. We reverse. I. AFDC is a joint federal-state program designed to provide financial assistance to needy, dependent children and their families. 42 U.S.C. 601 (1988). Although states, as the primary administrators of the program, are given broad discretion to define benefit levels and eligibility requirements, state programs must conform with federal laws and regulations in order to receive matching federal funds. Id. Federal HHS regulations set maximum limits on the ___ resources a family may own and still qualify to receive AFDC benefits. Under the regulations in effect before 1975, families with more than $2,000 in real and personal property did not qualify for AFDC benefits. 45 C.F.R. 233.20 (a)(3) -2- 2 (1974). These early regulations exempted from the calculation of family resources the value of certain assets, including, without limitation, the value of one automobile. Id. ___ In 1975, the Secretary of the Department of Health, Education and Welfare (the predecessor to HHS) amended the regulations and, for the first time, attempted to place a cap on the automobile exemption. The new regulation set the cap at $1,200 retail market value any market value in an automobile exceeding the $1,200 limit would now count toward the overall resource limit. 40 Fed. Reg. 12,507 (1975). The D.C. Circuit, however, subsequently struck down the regulation in National Welfare Rights Org. v. Mathews, 553 _____________________________ _______ F.2d 637, 643 (D.C. Cir. 1976).1 Thus after 1976, the automobile exemption was once again governed by the prior version of the regulation, which completely exempted the value of one automobile from the calculation of family resources. See 41 Fed. Reg. 30,647 (1976). ___ In 1981, Congress enacted the Omnibus Budget Reconciliation Act of 1981 ("OBRA"), which amended the AFDC  ____________________ 1. Although the court found that the governing statute authorized the Secretary to set resource limits for participation in the AFDC program, the court held the regulation invalid because: (1) the Secretary improperly based the limit on "market" rather than "equity" value; and (2) the Secretary failed to articulate a sufficient factual basis for the $1,200 figure. National Welfare Rights Org., _____________________________ 533 F.2d at 648-49. -3- 3 program by statutorily reducing from $2,000 to $1,000 the maximum resource limit for AFDC recipients.2 Pub. L. No. 97-35, 95 Stat. 357, 843 (1981); 42 U.S.C. 602(a)(7)(B) (Supp. V 1993). The purpose of this amendment was to cut costs and to limit AFDC benefits to only the most needy. See ___ Champion v. Shalala, 33 F.2d 963, 967 (8th Cir. 1994). At ________ _______ the same time, Congress allowed states to exclude from calculation of the overall resource limit "so much of the family member's ownership interest in one automobile as does _______ not exceed such amount as the Secretary may prescribe." 42 ______________________________________________________ U.S.C. 602(a)(7)(B)(i) (Supp. V 1993) (emphasis added). Pursuant to this delegation of authority, the Secretary of HHS in 1982 promulgated a regulation setting the automobile resource exemption at $1,500. 45 C.F.R. 233.20(a)(3)(i)(B)(2) (1993).3 Any equity value4 in an  ____________________ 2. States were still permitted, however, to set resource limits at a lower level. 42 U.S.C. 602(a)(7)(B) (Supp. V 1993). 3. The full text of the challenged regulation reads: The amount of real and personal property that can be reserved for each assistance unit shall not be in excess of one thousand dollars equity value (or such lesser amount as the State specifies in its State plan) excluding only: . . . (2) One automobile, up to $1,500 of equity value or such lower limit as the State may specify in the State plan; (any excess equity value must be applied towards the general resource limit specified in the State plan. -4- 4 automobile that exceeded this amount would now be counted toward the $1,000 overall resource limit, which, if exceeded, leaves a family ineligible for AFDC. The automobile resource exemption has since remained at $1,500, although it has received some attention from both Congress and the Secretary. In 1988, the House of Representatives passed, as part of the Family Support Act of 1988, Pub. L. No. 100-485, 102 Stat. 2343, 2356 (1988), a bill containing a provision that would have allowed some states to experiment with a $4,500 automobile resource exemption. The Senate version of the bill did not contain such a provision. The conference committee adopted the Senate version, but directed the Secretary to review the automobile resource regulations "and to revise them if he determines revision would be appropriate." H.R. Conf. Rep. No. 998, 100th Cong., 2d Sess. 189 (1988), reprinted in 1988 ____________ U.S.C.C.A.N. 2879, 2976-77. After reviewing the regulation, the Secretary in 1991 declined to revise the figure. 55 Fed. Reg. 44,524 (1990); 56 Fed. Reg. 17,358 (1991). In a 1992 letter to Senator Dennis DeConcini, the Secretary explained that increasing the exemption to $3,000 would have cost the federal government more than $200 million and would have  ____________________ 45 C.F.R. 233.20(a)(3)(i)(B) (1993). 4. The regulations define "equity value" as "fair market value minus encumbrances (legal debts)." 45 C.F.R. 233.20 (a)(3)(ii)(F)(4) (1993). -5- 5 required corresponding offsets in other programs. See ___ Frederick v. Shalala, 862 F. Supp. 38, 40 (W.D.N.Y. 1994). _________ _______ II. Plaintiffs are a class of New Hampshire residents who own vehicles with equity values in excess of $1,500 and, but for the Secretary's automobile resource regulation, would be entitled to receive AFDC benefits. The named plaintiffs in this case, Ellen Brown and Mary Smith5, are two mothers on low incomes who were denied AFDC benefits in 1991 and 1992, respectively, because they owned vehicles whose equity values exceeded the automobile resource exemption, thus placing them over the general resource limit. Brown owned a 1989 Toyota Celica, Smith a 1990 Mercury Topaz. Both Brown and Smith live in rural areas of New Hampshire, where there is no adequate public transportation and an automobile is a practical necessity. Plaintiffs filed suit against the Secretary of HHS, challenging the $1,500 automobile resource exemption as arbitrary and capricious on two grounds. They argued: (1) that the regulation was arbitrary and capricious when promulgated in 1982; and (2) that the Secretary's failure to adjust the figure for inflation has made it arbitrary and capricious today. Plaintiffs sought declaratory and  ____________________ 5. These are not their real names. The district court granted named plaintiffs leave to use pseudonyms in order to protect their privacy. -6- 6 injunctive relief. Since there were no disputed issues of materialfact,thepartiesfiled cross-motionsforsummaryjudgment. The district court denied the Secretary's motion for summary judgment and granted plaintiffs' motion for summary judgment, finding the $1,500 automobile resource exemption arbitrary and capricious today given the Secretary's failure to adjust it for inflation. The court wrote: "To use a fourteen-year old standard as a criteria [sic] of the equity in a motor vehicle in 1979 is an anachronism considering the purchasing power of a dollar today." The court enjoined the Secretary from further relying upon the regulation to deny benefits to otherwise- eligible New Hampshire residents. The Secretary now appeals. III. The issues in this appeal have been the subject of considerable litigation in the federal courts. The two courts of appeals that have considered the regulation have upheld it. Champion v. Shalala, 33 F.3d 963 (8th Cir. 1994); ________ _______ Falin v. Sullivan, 776 F. Supp. 1097 (E.D. Va. 1991), aff'd _____ ________ _____ per curiam, 6 F.3d 207 (4th Cir. 1993), cert. denied, 114 S. __________ ____________ Ct. 1551 (1994). Four district courts have also upheld the regulation. Noble v. Shalala, No. 92-N-2495 (D. Colo. Nov. _____ _______ 30, 1994); Frederick v. Shalala, 862 F. Supp. 38 (W.D.N.Y. _________ _______ 1994); Gamboa v. Rubin, No. 92-00397, 1993 WL 738386 (D. ______ _____ Hawaii Nov. 4, 1993), appeal filed, No. 94-15302 (9th Cir. ____________ -7- 7 Jan. 26, 1994); Hall v. Towey, No. 93-1780-CIV-T-21B (M.D. ____ _____ Fla. Dec. 10, 1993). Two district courts, not including the district court in this case, have struck down the regulation. Lamberton v. Shalala, 857 F. Supp. 1349 (D. Ariz. 1994); _________ _______ Hazard v. Sullivan, 827 F. Supp. 1348 (M.D. Tenn. 1993), ______ ________ appeal filed sub nom. Hazard v. Shalala, No. 93-6214 (6th ______________________ ______ _______ Cir. Sept. 17, 1993). We find the opinions of the Fourth Circuit in Falin _____ and Eighth Circuit in Champion to be persuasive. We agree ________ with them that the regulation was not arbitrary and capricious when promulgated and is not arbitrary and capricious today. A. Regulation Valid When Promulgated _________________________________ Our standard of review is very deferential. In enacting OBRA, Congress explicitly delegated to HHS the authority to set the figure for the automobile resource exemption; the states could exempt only "so much of the family member's ownership interest in one automobile as does not exceed such amount as the Secretary may prescribe." 42 ______________________________ U.S.C. 602(a)(7)(B)(i) (Supp. V 1993) (emphasis added). No standard was legislatively set to guide the Secretary in prescribing the exemption. Where the delegation of authority is this complete, a court can overturn the regulation only if it is "arbitrary, capricious, or manifestly contrary to the statute." Chevron v. Natural Resources Defense Council, 467 _______ _________________________________ -8- 8 U.S. 837, 844, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984); see ___ 5 U.S.C. 706(2)(A) (1988). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Chevron, 467 U.S. at 843-44; see McDonald v. Secretary of _______ ___ ________ ____________ Health and Human Serv., 795 F.2d 1118, 1122 n.5 (1st Cir. _______________________ 1986). A regulation will be arbitrary and capricious where: the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins., 463 __________________________ __________________________ U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983). In reviewing a regulation, the court may not substitute its own judgment for that of the agency. Rather, the court must defer to the agency if the agency's findings have a rational basis and the regulation is reasonably related to the purposes of the enabling legislation. Bowman Transp., Inc. ____________________ v. Arkansas-Best Freight Sys., 419 U.S. 281, 290, 95 S. Ct. __________________________ 438, 42 L. Ed. 2d 447 (1974); Conservation Law Found. v. ________________________ Secretary of the Interior, 864 F.2d 954, 957-58 (1st Cir. __________________________ 1989). As this is an appeal from summary judgment, review of -9- 9 the district court's determination is de novo. Gaskell v. __ ____ _______ Harvard Coop. Soc'y, 3 F.3d 495, 497 (1st Cir. 1993). ___________________ In setting the regulation in 1982, the Secretary relied almost exclusively upon a study of food stamp recipients6 conducted in 1979.7 The study purported to show that approximately 96 percent of food stamp recipients who owned an automobile had an equity value in that automobile of under $1,500. The Secretary reasoned that the food stamp survey provided an adequate picture of the equity ownership of AFDC recipients, since there was a substantial overlap in the populations of food stamp and AFDC recipients. Moreover, the percentage may even have been greater than 96 percent in the AFDC population, since food stamp recipients are, on average, more affluent than AFDC recipients. The Secretary explained: We chose $1,500 as the maximum equity value for an automobile on the basis of a Spring 1979 survey of food stamp  ____________________ 6. The food stamp program is governed by 7 U.S.C. 2011 et seq. (1988). _______ 7. The study was titled: Assets of Low Income Households: _________________________________ New Findings on Food Stamp Participants and Nonparticipants, ____________________________________________________________ Report to the Congress, January 1981, Food and Nutrition Service, U.S. Department of Agriculture. When AFDC recipients first challenged the instant regulation, the Secretary was unable to produce a copy of the food stamp study. Accordingly, the district court in that first case found the regulation arbitrary and capricious, given the lack of supporting data in the record. We Who Care, Inc. v. __________________ Sullivan, 756 F. Supp. 42, 46-47 (D. Me. 1991). The ________ Secretary has since been able to produce the study, and subsequent challenges have included the study in the record. -10- 10 recipients. Data from that survey suggest that 96 percent of all food stamp recipients who own cars had equity value in them of $1,500 or less. In that the Federal maximum limit should be set within the range of the vast majority of current recipients and given that the food stamp population tends to be, on average, more affluent than AFDC recipients, this limit appears reasonable and supportable. 47 Fed. Reg. 5648, 5657-58 (1982). 1. Failure to Consider Other Factors Did Not Violate ___________________________________________________ Congressional Intent ____________________ Plaintiffs argue that the regulation, even when first adopted in 1982, was arbitrary and capricious because the Secretary, in considering only whether the "vast majority of current recipients" fell within the new limit, failed to consider other important factors in setting the $1,500 limit. Plaintiffs concede that OBRA was enacted primarily to reduce cost and limit the number of AFDC recipients, but argue that the court must also look to AFDC's broader purposes of promoting employment and fostering self-sufficiency. See 42 ___ U.S.C. 601 (1988); Shea v. Vialpando, 416 U.S. 251, 253, 94 ____ _________ S. Ct. 1746, 40 L. Ed. 2d 120 (1974). In light of these purposes, plaintiffs read OBRA's delegation of authority to the Secretary to set the automobile resource exemption as indicating that Congress intended to allow each recipient to retain a safe, reliable vehicle. According to plaintiffs, the Secretary was obliged to consider such factors as: (1) the costs of used cars; (2) regional conditions that impact -11- 11 transportation needs; (3) the importance of vehicles in enabling families to become self-sufficient. In considering only whether the "vast majority" of AFDC recipients would be affected by the new figure, plaintiffs argue, the Secretary promulgated a regulation that was inconsistent with congressional intent. See State Farm, 463 U.S. at 43. ___ __________ We do not agree. We have little to add, on this point, to the opinion of the Eighth Circuit and to the opinion of the district court in Falin, 776 F. Supp. 1097, on _____ which the Fourth Circuit rested its judgment. Falin, 6 F.3d _____ at 207. OBRA delegates to the Secretary, and to no one else, the unqualified authority to prescribe the amount of the automobile resource exemption. 42 U.S.C. 602(a)(7)(B)(i) (Supp. V 1993). Congress made no express provision for the standards that the Secretary was to apply when establishing the amount of the automobile exemption. Nowhere in the statute did Congress require the Secretary to ensure to all AFDC recipients the right to a "safe and reliable" vehicle, or to pay special attention to the other policy objectives urged by plaintiffs. Congress left it to the Secretary to decide what policies should be given priority when figuring the exemption. The plain purpose of OBRA, moreover, was to cut costs by limiting the number of AFDC recipients to only those -12- 12 who were most needy.8 To that end, Congress cut the overall resource limit in half, from $2,000 to $1,000. At the same time, the value of the automobile, previously completely exempted, would now be limited by regulation. S. Rep. No. 139, 97th Cong., 1st Sess. 503 (1981), reprinted in 1981 ____________ U.S.C.C.A.N. 396, 769-70. The $1,500 figure the Secretary adopted, while consistent with OBRA's cost-cutting purpose, insofar as it placed a cap on the exemption, was not exceptionally restrictive at the time it was adopted; the Secretary calculated that it would exempt as many as 96 percent of then-current AFDC recipients. This effect would appear less draconian than the effect of Congress's halving the overall resource limit, from $2,000 to $1,000. After the regulation was promulgated, Congress itself twice considered and twice rejected any increase in  ____________________ 8. The Senate report explained the reduction in resource limit and the grant of authority to the Secretary to prescribe a limit on the automobile exemption: The committee believes that the present regulatory limit allows AFDC to be provided in situations in which families have resources upon which they could reasonably be expected to draw. . . . The committee agreed to limit the value of resources to assure that aid would be restricted to those most in need. S. Rep. No. 139, 97th Cong., 1st Sess. 503 (1981), reprinted _________ in 1981 U.S.C.C.A.N. 396, 769-70. See Dickenson v. Petit, __ ___ _________ _____ 692 F.2d 177, 179, 181 (1st Cir. 1982) (noting that OBRA was enacted "to reduce the size of the AFDC grant" and to "disburs[e] benefits only to the most destitute"). -13- 13 the Secretary's $1,500 automobile resource limit.9 While nonaction by Congress is ordinarily a dubious guide, see ___ Brown v. Gardner, ___ U.S. ___, 115 S. Ct. 552, 557, 63 _____ _______ U.S.L.W. 4035 (1994), it may become significant where proposals for legislative change have been repeatedly rejected, see Bob Jones Univ. v. United States, 461 U.S. 574, ___ _______________ _____________ 599-601, 103 S. Ct. 2017, 76 L. Ed. 2d 157 (1983). The failed legislative attempts since 1982 to increase the automobile exemption plainly suggest that the regulation as written was not inconsistent with congressional intent. See ___ United States v. Rutherford, 442 U.S. 544, 554 n.10, 99 S. ______________ __________ Ct. 2470, 61 L. Ed. 2d 68 (1979) ("[O]nce an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.") (quotations omitted). Plaintiffs read too much from the broader purposes of AFDC, and not enough from the specific purpose of OBRA,  ____________________ 9. In 1987, the House of Representatives considered inserting a provision in the OBRA of 1987 allowing states to experiment with a $4,500 automobile equity exemption. H.R. 3545, 100th Cong., 1st Sess., 9111(c), 133 Cong. Rec. 29,966, 30,069 (1987). The final version of the statute did not contain the provision. Pub. L. No. 100-2-3, 101 Stat. 1330 (1987). In 1988, the House again considered adding such a provision to the Family Support Act, as described supra. _____ This proposal was similarly defeated. -14- 14 which was the legislation that actually authorized the Secretary to set the regulation. See Brewer v. Madigan, 945 ___ ______ _______ F.2d 449, 457 (1st Cir. 1991) ("The enabling statute . . . is the principal source of relevant factors to be considered by the agency in promulgating regulations.") (citations omitted). Even if, as plaintiffs argue, the existence of the automobile resource exemption implies that Congress intended AFDC recipients to be able to retain some kind of vehicle,10 Congress explicitly delegated the authority to the Secretary to determine exactly how much of a person's equity in the vehicle to exempt. See Frederick, 862 F. Supp. ___ _________ at 43-44; Gorrie v. Bowen, 809 F.2d 508, 516 n.12 (8th Cir. ______ _____ 1987) ("appeals to the 'fundamental purpose' of the AFDC program . . . are unhelpful" where Congress has initiated a change in policy (citations omitted)); see also Rodriguez v. ___ ____ _________ United States, 480 U.S. 522, 526, 107 S. Ct. 1391, 94 L. Ed. _____________ 2d 533 (1987) ("[I]t frustrates rather than effectuates legislative intent simplistically to assume that whatever ________ furthers the statute's primary objective must be the law.") In setting the limit to include what he believed to be the "vast majority" of AFDC recipients at that time, the Secretary acted consistently with OBRA and not inconsistently  ____________________ 10. We express no opinion on this issue. See infra Part ___ _____ III.B.1. -15- 15 with the broader purposes of AFDC. Accord Champion, 33 F.3d ______ ________ at 967; Falin, 776 F. Supp. at 1101. _____ 2. Food Stamp Survey Provided Rational Basis _________________________________________ We find little merit in plaintiffs' assertion that the food stamp study did not provide a rational basis for the Secretary's establishment of the $1,500 automobile equity limit. Plaintiffs argue that the food stamp and AFDC programs are two distinct programs with different eligibility requirements. They further insist that there is no support in the administrative record for the Secretary's assumption that there is "extensive overlap" in the two populations or that the food stamp population is, on average, more affluent than the AFDC population. Plaintiffs say that food stamp recipients were already subject to an automobile-asset limitation at the time of the study, while AFDC recipients at that time were not subject to such a limitation. Thus, the fact that 96 percent of food stamp recipients owning an automobile had equity of less than $1,500 may simply have been a function of the food stamp program's preexisting equity limits. Micro-arguments of this sort, however, ignore the breadth of the Secretary's discretion. The Secretary was not required to base her regulations only on perfect information. Rather, the Secretary's policy choice needed only to be "rational." See State Farm, 463 U.S. at 43; Frederick, 862 ___ ___________ _________ -16- 16 F. Supp. at 42 (stating that the issue is not "whether the Secretary used the best available source to develop a regulation, but whether the Secretary's conduct was reasonable"). The Secretary here acted reasonably in relying on the food stamp study. Accord Champion, 33 F.3d at 966; ______ ________ Falin, 776 F. Supp. at 1101. It is undisputed that the food _____ stamp study provided the best data available at the time. The study was based on a 1979 survey which collected asset- ownership data from a statistically valid sample of 11,300 households of all income levels nationwide. Paul Bordes, who provided technical support to the Secretary while the regulation was being promulgated, noted in his deposition that equity data on aid recipients were extremely hard to come by. None of the comments at that time suggested any other sources of data.11 There was evidence, moreover, of overlap in the food stamp and AFDC populations. Bordes noted that in 1981, approximately 80 percent of AFDC recipients  ____________________ 11. Plaintiffs now suggest that the same raw 1979 census data that provided the basis for the study could have been used to perform a separate study on assets among AFDC recipients. Yet, at the time the regulations were promulgated, such a study had not been performed and, according to the Secretary, would have consumed a tremendous amount of scarce resources to perform. The Secretary was not required to use the most accurate data theoretically possible. It was not unreasonable for the Secretary to rely on the already-available study as an approximate measure of asset ownership among AFDC recipients, rather than commit agency resources to the performance of an additional, time- consuming study. -17- 17 also received food stamps. And the assumption that AFDC recipients were on the whole more affluent than food stamp recipients was a judgment within the expertise of the agency to make. That assumption was undisputed at the time. We, therefore, believe the Secretary acted rationally in relying on the food stamp study as a rough approximation of automobile equity ownership among AFDC recipients. Plaintiffs also point to alleged statistical flaws in the study itself. Plaintiffs argue that the 96 percent figure (for food stamp recipients who owned automobiles and had equity in those automobiles under $1,500) was based on a computational error, since it erroneously included the percentage of the recipients who did not own cars at all. Plaintiffs suggest (and the Secretary now concedes) that a more accurate figure would be 90 percent. Plaintiffs also argue that the figure assumes that, within the 17 percent of recipients for whom there were no automobile-equity data available, the distribution of automobile equity ownership was identical to that within the population for which data were available i.e. that there was no systematic bias in the reporting of vehicle equity. Plaintiffs argue that this assumption is unwarranted, since it is reasonable to suppose that those owning higher valued automobiles would be more likely to fail to provide information on automobile equity, -18- 18 for fear of disqualifying themselves from the program.12 Plaintiffs argue that these statistical flaws rendered the Secretary's reliance on the study unreasonable. We agree with the Eighth Circuit in Champion and ________ the Fourth Circuit in Falin that, even assuming that the more _____ accurate figure is 90 percent, the study still provided a rational basis for the Secretary's finding that the $1,500 limit was "within the range of the vast majority of current recipients," since 90 percent is still a "vast majority." 47 Fed. Reg. at 5657; see Champion, 33 F.3d at 967 n.5; Falin, ___ ________ _____ 776 F Supp. at 1100, aff'd per curiam, 6 F.3d 207. Although ________________ plaintiffs suggest that systematic bias in underreporting was possible, they have presented no evidence that it actually occurred. Where there was no evidence of bias, it was not unreasonable for the Secretary to assume for the purposes of calculation that no such bias existed. Thus neither of these alleged statistical weaknesses rendered the study an insufficient basis for the Secretary's regulation. 3. Secretary Responded Adequately to Comments __________________________________________ Plaintiffs also argue that the Secretary failed adequately to respond to comments and criticisms when promulgating the regulation. Plaintiffs contend that, during the rulemaking process, the Secretary received numerous  ____________________ 12. In support, plaintiffs submitted a report by Peter S. Fisher, an economist. The report was titled: An Economic ____________ Analysis of the AFDC $1,500 Motor Vehicle Equity Limit. ______________________________________________________ -19- 19 comments critical of the $1,500 limit. Some of these comments criticized the relevance and validity of the food stamp study. In response, the Secretary wrote: We stand by our original position. The choice of $1,500 as the maximum equity value for an automobile was based on the data from a Spring 1979 survey of food stamp recipients. We regard the limit of $1,500 equity value in an automobile as reasonable and supportable. 47 Fed. Reg. at 5657. Plaintiffs argue that this was not a meaningful response to the comments, and that the regulation therefore violated the notice and comment provisions of the Administrative Procedure Act, 5 U.S.C. 553(c) (1988)13. We do not agree. Only a dozen comments were submitted on the automobile resource exemption, of which ten took issue with the $1,500 amount. Each of these comments was fairly brief, criticizing the figure as generally too low. Only one of them suggested an alternative to the $1,500 figure. None of them suggested any alternative data upon which to base the figure. Given the nature of the comments,  ____________________ 13. 5 U.S.C. 553(c) (1988) reads, in relevant part: After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. -20- 20 we do not find the Secretary's brief response so inadequate as to violate 553(c). Accord Champion, 33 F.3d at 966 n.4; ______ ________ cf. Brewer, 945 F.2d at 457 n.7. ___ ______ We conclude, therefore, that the $1,500 automobile exemption was neither arbitrary nor capricious when promulgated. B. Regulation Valid Today ______________________ Plaintiffs insist that, even if the regulation was valid when promulgated, it must be arbitrary and capricious today given the Secretary's failure to increase the $1,500 cap for inflation. While a refusal to amend a rule, like the promulgation of the rule in the first instance, may be reviewable under the "arbitrary and capricious" standard,14 "[r]eview under the 'arbitrary and capricious' tag line . . . encompasses a range of levels of deference to the agency, and . . . an agency's refusal to institute rulemaking proceedings is at the high end of the range." American Horse Protection _________________________ Ass'n v. Lyng, 812 F.2d 1, 4 (D.C. Cir. 1987) (citations _____ ____ omitted). Thus, a refusal to institute rulemaking "is to be  ____________________ 14. In Heckler v. Chaney, 470 U.S. 821, 825, 105 S. Ct. _______ ______ 1649, 84 L. Ed. 2d 714 (1985), the Supreme Court held that an agency's refusal to take ad hoc enforcement action is presumptively unreviewable. However, it has been held that the Heckler presumption does not apply to an agency's refusal _______ to institute rulemaking. American Horse Protection Ass'n v. _______________________________ Lyng, 812 F.2d 1, 4-5 (D.C. Cir. 1987). See also Heckler, ____ ___ ____ _______ 470 U.S. at 825 n.2 (expressly noting that the Court was not addressing review of an agency's refusal to institute rulemaking). -21- 21 overturned 'only in the rarest and most compelling of circumstances,' which have primarily involved 'plain errors of law, suggesting that the agency has been blind to the source of its delegated power.'" Id. at 5 (citations ___ omitted).15 Nothing of the sort appears here. 1. Not Inconsistent With Statute _____________________________ Plaintiffs reiterate their position that, in light of AFDC's general scheme, OBRA evinces an intent that AFDC recipients be able to retain a safe and reliable vehicle. Plaintiffs then argue that, even if the regulation were consistent with this purpose when promulgated, the Secretary's failure to adjust the $1,500 figure for inflation necessarily makes it inconsistent with this broader purpose today. The increase in the consumer price index since 1982 has effectively halved the value of $1,500. Accordingly, that equity level is today consistent only with a car that is eight to nine years old and has 80,000-120,000 miles on it.  ____________________ 15. See, 1 Kenneth C. Davis & Richard J. Pierce, ___ Administrative Law Treatise 6.9, at 280 (3d ed. 1994): ___________________________ An agency can have any number of plausible reasons for declining to [undertake rulemaking], and courts are poorly positioned to evaluate the reasons most frequently given by agencies. These include an agency's decision that . . . the problem is not sufficiently important to justify allocation of significant scarce resources given the nature of the many other problems the agency is attempting to address. A court rarely has enough information to second guess agency decisions premised on this type of reasoning. -22- 22 Because such a car is not likely to be safe or reliable, plaintiffs argue, the regulation today violates OBRA's broader purpose. As with their argument in the previous section, plaintiffs read too much into the broad scheme of the AFDC program and not enough into the cost-cutting purpose of OBRA, the statute that actually authorized the Secretary to set the figure. Nowhere does OBRA or the AFDC statute require the Secretary to set the automobile exemption high enough so as to enable all or most AFDC recipients to acquire and maintain a "safe and reliable vehicle." As there was no stated obligation of this sort in the first instance, there can be no obligation to implement such a standard now. The Secretary reasonably defends her continuing adherence to the $1,500 figure without adjustment for inflation on the ground that this is consistent with both the text and purpose of OBRA. There is no language in OBRA obligating the Secretary periodically to adjust the automobile resource exemption for inflation, nor, as earlier discussed, does OBRA tell the Secretary to set the cap at a figure that will furnish a certain quality or level of transportation. Instead, by its terms, OBRA gives the Secretary unqualified discretion to prescribe the figure.16  ____________________ 16. The district court ignored the fact that Congress has delegated policy-making in this area to the Secretary. It thought the $1,500 figure to be inadequate for various policy -23- 23 Had Congress wanted to require the Secretary to make periodic adjustments for inflation, it could easily have said so in the statute, and indeed has done so in other instances. See, ___ e.g., 42 U.S.C. 415(i) (social security benefits) (1988); ____ 29 U.S.C. 720(c) (1988) (vocational rehabilitation grants); 5 U.S.C. 8340 (1988) (annuities for retired federal employees); Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, 107 Stat. 312, 675 (1993) (codified at 7 U.S.C. 2014(g)(2) (Supp. V 1993)) (automobile exemption under food stamp program). Nor given the total absence of any standards within the statute can an obligation to adjust for inflation be inferred from a statutory guide to the Secretary's discretion implying the necessity to maintain the exemption at a certain level over time.17 Compare _______  ____________________ reasons that it elucidated: Used today, [the $1,500 automobile equity exemption] can result in an AFDC recipient losing his or her job by not allowing the recipient the availability of a safe operative motor vehicle in lieu of a schlock vehicle. The end result would be for the government or other relief agencies making up the difference in lost income. It destroys initiative of those who are endeavoring to get off the public dole and exacerbates the personal degradation of many who are reluctantly on relief only as a last resort. However, the courts are not empowered by Congress to impose their concepts of good policy on the Secretary. 17. A need to adjust for inflation might be implied, for example, if the statute had explicitly stated that the Secretary must set the automobile exemption at an amount high enough at all times to ensure that AFDC recipients can retain -24- 24 Maine Ass'n of Interdependent Neighborhoods v. Petit, 659 F. ____________________________________________ _____ Supp. 1309, 1323 (D. Me. 1987). The Secretary, furthermore, plausibly contends that her failure to adjust the cap is consistent with OBRA's original purpose to move towards tightening the AFDC eligibility requirements over time. S. Rep. No. 139 at 503, reprinted in 1981 U.S.C.C.A.N. at 769- ____________ 70; Dickenson, 692 F.2d at 179.  _________ As we have earlier pointed out, it is also highly significant that Congress has twice since 1981 considered revising the $1,500 figure and on both occasions has declined to do so, suggesting its implicit acceptance of the Secretary's failure to adjust the figure upwards. See ___ Rutherford, 442 U.S. at 554 n.10. Congress itself, moreover, __________ has never seen fit to adjust for inflation the related overall resource limit of $1,000 which it set in 1981. See ___ Champion, 33 F.3d at 967. The fact that Congress itself has ________ not adjusted so closely-related a provision for inflation suggests that the Secretary's similar refusal to adjust the regulation is not plainly inconsistent with congressional intent. See American Home Protection, 312 F.2d at 4.18  ___ ________________________  ____________________ a "safe and reliable vehicle." As we have seen, however, OBRA provides no such standard to inform the Secretary's discretion on a continuing basis. 18. Plaintiffs take issue with the Secretary's failure to adjust the figure after being asked by the conference committee to review the regulation in the wake of passage of the Family Support Act of 1988. They argue that the Secretary's failure to adjust the figure was arbitrary and -25- 25 We recognize, as a possible argument, that Congress's action in legislating an express automobile exemption might be interpreted, by implication, to prevent the Secretary from ever setting the amount so low as to eliminate the exemption altogether, i.e. a zero cap or a cap insufficient to allow most applicants to possess a serviceable vehicle. Counter to this argument is evidence strongly suggesting that the automobile exemption which had for a long time existed as a creature of the Secretary's earlier regulations was expressly incorporated in the statute in 1981 in order to make clear the Secretary's authority and duty to keep the exemption within bounds. Immediately before OBRA, the automobile exemption had been unlimited, the Secretary's earlier attempt at a $1,200 cap on a vehicle's market value having been overturned by the D.C. Circuit in 1976. National Welfare Rights Organ., 533 F.2d at ______________________________ 647. By expressly delegating to the Secretary unqualified authority to prescribe the equity amount of the exemption, Congress resurrected a cap and unequivocally put the ball in the Secretary's court. Given OBRA's primary cost-cutting aim  ____________________ capricious. However, the conference committee did not direct the Secretary to revise the figure; it only asked the Secretary to review the figure and "revise [it] if he ______ determined revision would be appropriate." 1988 U.S.S.C.A.N. ________________________________________ at 2976-77 (emphasis added). The Secretary reviewed the regulation and determined that revision was not appropriate. See 56 Fed. Reg. 17,358, 17,358 (1991). No more was ___ required. -26- 26 and Congress's evident desire to strengthen, not weaken, the Secretary's control over the amount of the exemption a zero cap or its functional equivalent, designed to avoid even worse offsets in other areas of the program, might well be within the Secretary's power to prescribe. But we need not decide if this is so. Even were we to assume, for purposes of argument, that the Secretary would lack the power to reduce the exemption to zero or its functional equivalent, the present case does not involve an amount so low. One thousand five-hundred dollars may be consistent only with a car that is eight to nine years old, with 80,000-120,000 miles on it as plaintiffs' expert opined but, presumably, there are many such cars still on the road. Nothing in the record indicates to the contrary, or that the Secretary's continued use of a $1,500 equity figure is the functional equivalent of eliminating altogether the automobile exemption.19 We conclude that the Secretary's inaction in respect to modifying the $1,500 figure for inflation is supportable both under OBRA's express language and as a reasonable construction of congressional intent. There is,  ____________________ 19. That the $1,500 reflects the owner's equity, and not necessarily the total value of the car, raises a further question, on which this record sheds little light, as to how restrictive the exemption is, in practice, in disallowing serviceable vehicles. Nor do we know how many persons otherwise eligible for AFDC are currently eliminated by the $1,500 cap. -27- 27 therefore, no "compelling" circumstance "suggesting that the agency has been blind to the source of its delegated power" such as to warrant our ordering a rulemaking. American Horse ______________ Protection Ass'n, 812 F.2d at 4. ________________ 2. Not Inconsistent With Original Rationale ________________________________________ Plaintiffs argue that, even if not necessarily contrary to OBRA's language and Congress's intent, the $1,500 figure today runs counter to the Secretary's original rationale for adopting it. In 1982, the Secretary determined on the basis of the then available data that $1,500 would include the "vast majority" of AFDC recipients. Because of the effects of inflation, that can no longer be assumed to be true, plaintiffs point out. Accordingly, plaintiffs argue, the regulation is today arbitrary and capricious, as the figure is inconsistent with the agency's stated rationale. (This was the argument that prevailed in Hazard v. Sullivan, ______ ________ 827 F. Supp. 1348 (M.D. Tenn. 1993), one of the two district court cases that struck down the regulation). The Secretary responds, reasonably we think, that her predecessor's stated rationale for the 1982 regulation need not be interpreted as an ongoing commitment to ensure that the vast majority of AFDC recipients are able to retain an automobile. Rather, the rationale can, and the Secretary argues should, be interpreted as a desire to "grandfather" those who were receiving AFDC at that time, i.e. to ensure -28- 28 that large numbers of existing recipients not be abruptly terminated. In parsing the language in the federal register, the Secretary places the emphasis on the word "current": "the Federal maximum limit should be set within the range of the vast majority of current recipients . . . ." 47 Fed. _______ Reg. at 5657-58 (emphasis added). Thus, even assuming that over time the limit has excluded more and more individuals from AFDC, that is not necessarily inconsistent with the original stated rationale. Moreover, nothing in the statute necessarily requires the Secretary to include the "vast majority" of AFDC recipients in setting the limit. Indeed, even though an earlier Secretary emphasized this factor in 1982, nothing obligates the present Secretary to follow the same policy priorities. See Garnett, 905 F.2d at 782.20 ___ _______  ____________________ 20. Plaintiffs also argue that the failure to adjust the automobile resource exemption for inflation is arbitrary and capricious when compared to the Secretary's actions with respect to similar provisions in other benefit programs. Plaintiffs point to the vehicle asset limitation under the Supplemental Security Income ("SSI") program. Plaintiffs argue that in 1979, prior to the promulgation of the AFDC automobile resource exemption, the Secretary proposed to increase the pre-existing SSI automobile exemption to "allow for inflation." 44 Fed. Reg. 43,265 (1979). We agree with the Secretary that this does not make the Secretary's refusal to adjust the AFDC automobile resource exemption arbitrary and capricious. We note that, despite initially expressing its intent to do so, the Secretary never adjusted the SSI automobile exemption for inflation, concluding instead that such an adjustment was unnecessary. See 50 Fed. Reg. 42,683, 42,686 (1985). Thus, there is in ___ fact no inconsistency. Furthermore, plaintiffs cite no cases holding that an agency must treat separate and distinct benefit programs exactly the same. There may well be good -29- 29 3. One Final Note ______________ Having concluded that the Secretary's inaction in failing to adjust the $1,500 automobile resource exemption for inflation was not violative of the enabling statute or other law, we wish briefly to comment on a procedural matter not raised by either party: namely, plaintiffs' bringing of the inflation claim without first petitioning the Secretary for an amendment to the $1,500 exemption. Under the Administrative Procedure Act, "[e]ach agency shall give an interested person the right to petition for issuance, amendment, or repeal of a rule." 5 U.S.C. 553(e) (1988) _________ (emphasis added). Thus, prior to challenging an agency's failure to revise a rule in light of changed circumstances, a party can seek redress directly from the agency through a petition for amendment under 553(e). Where, as here, plaintiffs seek to raise a host of factual and policy issues (such as the impact of inflation) in a matter over which Congress has vested the Secretary with primary discretion, it was patently appropriate and, in many instances could be essential, for plaintiffs to have petitioned the agency before seeking judicial redress. Cf. ___ Myers v. Bethlehem Shipbuilding, 303 U.S. 41, 50-51, 58 S. _____ _______________________ Ct. 459, 82 L. Ed. 638 (1938) (It is "the long settled rule  ____________________ reasons for adjusting some provisions for inflation and not adjusting others. See Champion, 33 F.3d at 968. ___ ________ -30- 30 of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."). By presenting the arguments for amendment directly to the agency, plaintiffs would have placed before the agency their evidence regarding the effects of inflation on the ability of AFDC applicants to obtain transportation,21 and would have enabled the agency to take whatever corrective action it thought necessary. If the agency had granted the petition, there would have been no need for judicial review. If, as is more likely given the prior litigation on this issue, the agency had denied the petition, then judicial review might have been greatly facilitated by the existence of a more developed agency record22 or, at least, of an agency  ____________________ 21. As it is now, the Secretary was, as far as we are able to tell, first formally presented with the arguments for amendment of the rule in the context of an adversary proceeding. 22. 5 U.S.C. 555(e) (1988) provides: Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding. Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial. -31- 31 decision clarifying its particular policy reasons for the denial.23 Thus requiring a petition under these circumstances serves the purposes of the exhaustion doctrine (and the related doctrine of primary jurisdiction). See, ___ e.g., Midwater Trawlers Coop. v. Mosbacher, 727 F. Supp. 12, ____ _______________________ _________ 15 (D.D.C. 1989) (dismissing claim for failure to exhaust administrative remedies where plaintiff failed to petition for rulemaking under 5 U.S.C. 553(e)); Hoffman-LaRoche v. _______________ Harris, 484 F. Supp. 58, 60 (D.D.C. 1979) (same); cf. ______ ___ Kappelmann v. Delta Air Lines, Inc., 539 F.2d 165, 169, 171 __________ ______________________ (D.C. Cir. 1976) (invoking doctrine of primary jurisdiction where plaintiff failed to petition for rulemaking under 5 U.S.C. 553(e)); William V. Luneburg, Petitioning Federal Agencies for Rulemaking, 1988 Wis. L. Rev. 1, 55 (1988).24  ____________________ 23. Plaintiffs criticize the Secretary's reliance, in her brief, on arguments which plaintiffs call "post hoc rationalization[s]" for not adjusting the $1,500 figure for inflation. But plaintiffs can hardly complain of this where they voluntarily by-passed the agency in order to come straight to court. Despite plaintiffs' criticisms, moreover, some indication of a specific, non-"post-hoc" policy consideration can be gleaned from the 1992 letter from the previous Secretary to Senator Dennis DeConcini, already discussed supra. In that letter, the Secretary explained _____ that raising the figure to $3,000 would cost the federal government $200 million and require corresponding offsets in other programs. See Frederick, 862 F. Supp. at 40.  ___ _________ 24. The exhaustion doctrine, as applied in this case, is closely analogous to the doctrine of primary jurisdiction, under which a court may refrain from exercising jurisdiction over a controversy until an agency has had a chance to decide an issue of fact or policy within that agency's jurisdiction and special competence. See New England Legal Found. v. ___ __________________________ Massachusetts Port Authority, 883 F.2d 157, 171-72 (1st Cir. ____________________________ -32- 32 Nevertheless, while petitioning the agency would have been the better course, we have considered the merits of the claim on appeal without having demanded strict adherence to the doctrine of administrative exhaustion. The doctrines of administrative exhaustion and primary jurisdiction are judge-made rules to be applied on a case-by-case basis, taking into account the purposes of the doctrines. See McGee ___ _____ v. United States, 402 U.S. 479, 483, 91 S. Ct. 2457, 45 L. ______________ Ed. 2d 47 (1971); Pihl v. Massachusetts Dep't of Educ., 9 ____ _____________________________ F.3d 184, 190 (1st Cir. 1993); 2 Davis, supra, 15.2 at 307. _____ In this case, justice would not be served by remanding with directions to dismiss for nonexhaustion, nor is a remand to the agency for clarification of its reasons essential. The claim turns primarily on issues of law concerning the scope of the Secretary's powers; such issues of law we are equipped to settle (and have settled) now. Moreover, the Secretary has not objected to the lack of a petition, and such a petition would likely be futile anyway as the Secretary appears to have taken a firm stand, litigating this issue in several fora. Thus, the exact same issue would likely arise in the same posture after a petition was denied; resolving it now would in fact conserve judicial resources. See, e.g., ___ ____  ____________________ 1989). Both doctrines serve to allocate decision-making authority between agencies and the courts, and both doctrines look to similar considerations of judicial economy, agency expertise, etc. See 1 Davis, supra, 14.1 at 271.  ___ _____ -33- 33 Weinberger v. Salfi, 422 U.S. 749, 765-66, 95 S. Ct. 2457, 29 __________ _____ L. Ed. 2d 47 (1979) (considering claim despite failure to exhaust where petition would clearly be futile). While we have, therefore, decided the merits without requiring exhaustion, the exhaustion point should not go unnoticed. Had the case turned, as might have occurred under a different statute or in different circumstances, on review of the agency's precise policy reasons for inaction, only a record from within the agency could have yielded a satisfactory basis for judicial review. A trial in the district court would not be a viable alternative. See ___ Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654, ____________________________ _________ 110 S. Ct. 2668, 110 L. Ed. 2d 579 (1990); Citizens to ____________ Preserve Overton Park v. Volpe, 401 U.S. 402, 420-21, 91 S. _____________________ _____ Ct. 814, 28 L. Ed. 2d 136 (1971) (holding that if an agency provides reasons insufficient to permit a court to review its rationale, the proper remedy is to remand to the agency for additional investigation or explanation); see also American ___ ____ ________ Horse Protection Ass'n, 812 F.2d at 7-8 (remanding to agency ______________________ after finding that agency had not provided sufficient reasons for its denial of a petition for rulemaking); 1 Davis, supra, _____ 8.5 at 394. V. In the end, plaintiffs cite no cases, other than Hazard, that indicate that an agency must periodically ______ -34- 34 consider inflation adjustments in setting its eligibility standards for government benefits, absent a legislative directive to do so.25 The few cases that address the issue point the other way. See, e.g., Garnett, 905 F.2d at 782-83 ___ ____ _______ (Secretary not required to adjust guidelines for disability benefits to reflect changing market conditions, where statutory grant of discretion to set guidelines broad). Plaintiffs have, in any case, presented no evidence indicating that the Secretary's failure to adjust the figure for inflation is inconsistent with OBRA. Accord Champion, 33 ______ ________ F.3d at 968; Falin, 776 F. Supp. at 1101. _____ Reversed and remanded with directions to dismiss ___________________________________________________ the complaint. No costs.  _________________________  ____________________ 25. Plaintiffs cite Maine Ass'n of Interdependent ____________________________________ Neighborhood v. Petit, 659 F. Supp. 1309, 1323 (D. Me. 1987) ____________ _____ ("MAIN") for the proposition that it is unreasonable for an agency to fail to consider the effects of inflation when promulgating a rule. However, we agree with the Secretary that MAIN is distinguishable. MAIN involved the agency's use ____ ____ of data that was already eight years old at the time that it was used to promulgate the rule. Moreover, the delegation of rulemaking authority in that case was more circumscribed. -35- 35