80 F.3d 1338
 64 USLW 2658, 50 Soc.Sec.Rep.Ser. 520A,
Medicare & Medicaid Guide P 44,122,
96 Cal. Daily Op. Serv. 2392,
96 Daily Journal D.A.R. 4041
 Paul M. GAMBOA, Plaintiff-Appellant-Cross Appellee,
v.
Winona E. RUBIN, Director, Dept. of Human Services, State of
Hawaii,
Defendant-third-party-plaintiff--
Appellee--Cross Appellant,
v.
Donna E. SHALALA, Secretary of Health & Human Services,
Defendant-third-party-defendant--Appellee.
 Nos. 94-15302, 94-15303.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 1, 1995.
Decided April 9, 1996.
 
 Barbara A. Fabrey, Legal Aid Society of Hawaii, Honolulu, Hawaii, for plaintiff-appellant-cross-appellee, Paul M. Gamboa.
 Steven S. Michaels, Deputy Attorney General, Honolulu, Hawaii, for defendant-third party plaintiff-appellee-cross-appellant, Winona E. Rubin, Director, Department of Human Services.
 Christine N. Kohl, United States Department of Justice, Washington, D.C., for defendant-third party defendant-appellee, Donna E. Shalala, Secretary of Health and Human Services.
 Appeal from the United States District Court for the District of Hawaii; Harold M. Fong, Chief District Judge, Presiding. No. CV-92-00397-HMF.
 Before: PREGERSON, KOZINSKI, and HAWKINS, Circuit Judges.
 Opinion
 PREGERSON, Circuit Judge:
 
 
 1
 Paul M. Gamboa, on behalf of a certified class of low income people, appeals the district court's grant of summary judgment in favor of defendants Donna Shalala, Secretary of Health and Human Services ("the Secretary"), and, in part, in favor of Winona Rubin, director of the Hawaii Department of Human Services ("DHS"). The district court upheld a $1500 automobile equity limit for recipients of Aid for Families with Dependent Children ("AFDC"), but found that Hawaii was incorrectly applying that limit to determine Medicaid eligibility for certain individuals. We have jurisdiction under 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand.
 
 BACKGROUND
 
 2
 Paul Gamboa and members of the plaintiff class assert that the automobile equity limit set by the Secretary in 1982 is invalid. Plaintiffs contend that the $1500 limit was arbitrary and capricious when the Secretary issued it, and remains so because the Secretary has not adjusted the figure for inflation. The plaintiffs also argue that the Hawaii Department of Human Services improperly calculated the automobile equity allowed for certain recipients of Medicaid.
 
 
 3
 A. Facts and Prior Proceedings.
 
 
 4
 In November 1991, plaintiff Paul Gamboa had an operation to remove a brain tumor. Since then, he has been subject to disabling seizures. Gamboa owes approximately $40,000 in medical bills. He uses his car, a Buick, to take his two minor children to school, to go to the doctor's office, and to run errands.
 
 
 5
 On November 25, 1991, Gamboa applied for AFDC and Medicaid for himself and his two children. On December 31, 1991, DHS denied Paul Gamboa's application because the equity in his car exceeded the regulatory limit of $1500 set by the United States Department of Health and Human Services ("HHS") for AFDC recipients.[1]
 
 
 6
 Gamboa appealed the decision to a Hawaii state court, naming Winona E. Rubin, DHS Director, as the defendant. Because an HHS regulation was at issue, Rubin filed a third-party complaint against the Secretary of HHS. The Secretary then removed the action to the United States District Court for the District of Hawaii. In district court, Gamboa filed an amended complaint, adding the Secretary as a defendant and seeking certification of the case as a class action. The class, which includes all individuals who are ineligible for benefits because the equity in their automobiles exceeds $1500, was certified on October 6, 1992.
 
 
 7
 All parties filed cross motions for summary judgment. On November 4, 1993, the district court upheld the $1500 equity limit, granting HHS's motion for summary judgment and denying the plaintiffs' motion for summary judgment. The court also granted in part and denied in part DHS's motion for summary judgment. The court granted DHS's motion with respect to the $1500 equity limit, but denied it with respect to Hawaii's Medicaid regulations. On November 29, 1993, the district court granted the plaintiffs' motion for summary judgment on the Medicaid issue. Gamboa, plaintiffs, and Rubin now appeal.
 
 
 8
 B. Statutory Framework.
 
 
 9
 1. AFDC.
 
 
 10
 In 1935, Congress established the Aid to Families with Dependent Children ("AFDC") program. AFDC is a cooperative federal-state program which provides monetary assistance to needy, dependent children. The federal government prescribes eligibility criteria for AFDC recipients and provides states with matching funds for distribution. The states administer the program according to plans approved by HHS. See 45 C.F.R. §§ 201.2 & 233.10(b)(1); 42 U.S.C. § 601.
 
 
 11
 In 1955, the Secretary of the Department of Health, Education and Welfare ("DHEW"), HHS's predecessor, began imposing income and resource limitations on the states. See Hazard v. Shalala, 44 F.3d 399, 402 (6th Cir.1995). Under the regulations effective before 1975, families could qualify for AFDC benefits if they had less than $2000 in property. See Brown v. Secretary of Health and Human Servs, 46 F.3d 102, 104 (1st Cir.1995). These early regulations exempted the value of one automobile, regardless of its value, from the calculation of family resources. Id.
 
 
 12
 In 1975, the Secretary of DHEW issued a regulation that for the first time placed a cap on the automobile exemption. The regulation provided, that to the extent that a car's market value exceeded $1200, the difference would count toward a family's overall resource limit of $2000. Id. The District of Columbia Circuit struck down the regulation in National Welfare Rights Org. v. Mathews, 533 F.2d 637, 647-48 (D.C.Cir.1976), because the regulation failed to consider encumbrances on automobiles and because the administrative record gave no empirical basis for the limits the Secretary had chosen. As a result of the decision in National Welfare Rights, the automobile exemption reverted to the previous regulation which allowed the exemption of one car, regardless of its value. See Brown, 46 F.3d at 104.
 
 
 13
 In the Omnibus Budget Reconciliation Act of 1981 ("OBRA"), Congress for the first time imposed a statutory limitation on the amount of resources that an AFDC family may have. Pub.L. No. 97-35 § 2302, 95 Stat. 357, 844-5 (codified at 42 U.S.C. § 602(a)(7)(B)). OBRA amended the AFDC provisions, reducing the overall resource limit from $2000 to $1000 per family. The statute also provides that any state may exempt "so much of the family member's ownership interest in one automobile as does not exceed such amount as the Secretary may prescribe." 42 U.S.C. § 602(a)(7)(B)(i) (emphasis added).
 
 
 14
 In 1982, HHS adopted a regulation that set the automobile equity limit at $1500. 45 C.F.R. § 233.20(a)(3)(i)(B)(2). Under the regulation, an AFDC family can have only up to $1500 in equity in a car, and any amount over this equity limit is counted towards the $1000 statutory resource limit. The $1500 automobile equity limit was based on data from a 1979 survey of food-stamp recipients contained in a report submitted to Congress in 1981. The Secretary of HHS has not adjusted the $1500 equity limit for inflation since its adoption in 1982.
 
 
 15
 2. Medicaid.
 
 
 16
 Medicaid is a federal program that provides funds for medical assistance to indigent persons. See 42 U.S.C. § 1396 et seq. As with the AFDC program, states, like Hawaii, that participate in the Medicaid program must comply with federal regulations. Medicaid is a need-based program. As a result, Hawaii demands that Medicaid recipients satisfy certain resource limits.
 
 ANALYSIS
 
 17
 A. Standing.
 
 
 18
 We review questions of standing de novo. See Wedges/Ledges of Cal., Inc. v. Phoenix, 24 F.3d 56, 61 (9th Cir.1994). Article III of the United States Constitution limits the jurisdiction of our court to actions that present "cases" or "controversies," a requirement that is analyzed through the doctrine of standing. The Supreme Court articulated the requirements for Article III standing in Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992):
 
 
 19
 First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally-protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... the result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."
 
 
 20
 Id. at 560-61, 112 S.Ct. at 2136 (citations omitted).
 
 
 21
 Plaintiffs maintain they have standing to challenge the $1500 automobile equity limit because they allege that, but for this limit, they would have been eligible for AFDC benefits. Defendant Rubin asserts that plaintiffs' alleged injury will not "likely" be redressed with a favorable ruling. Defendant Rubin relies on Coakley v. Sunn, 895 F.2d 604 (9th Cir.1990). That case, however, is inapposite.
 
 
 22
 In Coakley, this court held that plaintiffs, who had received personal injury awards, did not have standing to challenge Hawaii's interpretation of the federal "lump sum" rule, 42 U.S.C. § 602(a)(17), which provides that AFDC recipients are ineligible for AFDC benefits when they receive a lump sum of income. 895 F.2d at 607. We reasoned that striking down Hawaii's regulation would not redress plaintiffs' injuries because the statute did not require states to provide any exception to the "lump sum" rule. Id. The statute at issue in Coakley provides that any "[s]tate may at its option recalculate the period of ineligibility ... [if] the income received has become unavailable to the members of the family for reasons that were beyond the control of such members." 42 U.S.C. § 602(a)(17) (emphasis added).
 
 
 23
 In this case, by contrast, the statute limits the states' discretion to exempt an applicant's equity in a car by the amount the Secretary prescribes as the automobile equity limit. See 42 U.S.C. § 602(a)(7)(B)(i). Thus, there is no question that a favorable ruling by this court will redress plaintiffs' injury-their denial of AFDC benefits. See Hazard, 44 F.3d at 403. If plaintiffs prevail, the regulation will be struck down until the Secretary promulgates a new regulation. During this interim period, the rule in existence before the $1500 limit was set will govern-namely that AFDC recipients may own one car regardless of its value. See National Welfare Rights, 533 F.2d at 647-648. And, when the Secretary sets the new automobile equity limit, that figure will be adjusted for inflation because this court would have struck down the $1500 limit as arbitrary and capricious. Plaintiffs therefore have standing to bring this action.
 
 
 24
 B. The $1500 Automobile Equity Limit.
 
 
 25
 The majority of courts that have examined the $1500 automobile equity limit regulation have upheld it. See Brown v. Secretary of Health and Human Servs, 46 F.3d 102 (1st Cir.1995); Hazard v. Shalala, 44 F.3d 399 (6th Cir.1995); Champion v. Shalala, 33 F.3d 963 (8th Cir.1994) (Heany, J., dissenting); Falin v. Shalala, 6 F.3d 207 (4th Cir.1993) (per curiam), cert. denied, --- U.S. ----, 114 S.Ct. 1551, 128 L.Ed.2d 200 (1994). We agree with these courts that the $1500 limit was valid when first established in 1982. We do not agree, however, that the $1500 limit, which has not been adjusted for inflation, continues to be valid.
 
 
 26
 This case raises the difficult issue of whether there are any constraints on the federal government's ability to cut costs and save money on one of its means-tested programs. We believe that there is one important constraint: an agency's budgetary decisions must maintain a rational relation to Congress's stated purposes for the means-tested program that is being cut. As will be discussed below, the Secretary's failure to adjust the automobile equity $1500 limit for inflation since its adoption almost 15 years ago has thwarted Congress's purpose in establishing the AFDC program and the Secretary's own rationale for adopting the $1500 limit.
 
 
 27
 1. Standard of Review.
 
 
 28
 We review a grant of summary judgment de novo. Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994). We must determine whether the evidence viewed in the light most favorable to the non-moving party presents any genuine issues of material fact and whether the district court correctly applied the relevant law. Id.
 
 
 29
 We must give significant deference to an agency's decision, especially here, where Congress has explicitly delegated to the Secretary the authority to issue implementing regulations. Under OBRA, Congress directed the Secretary to set the automobile resource exemption. 42 U.S.C. § 602(a)(7)(B)(i). We must not substitute our judgment for that of the agency. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866-67, 77 L.Ed.2d 443 (1983). Though our deference must be great, it is not unbounded. If the regulation is "arbitrary, capricious, or manifestly contrary to the statute" then we need not give it "controlling weight." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The agency has a duty to consider all "important aspect[s] of the problem" and render a plausible decision that is the "product of agency expertise." State Farm, 463 U.S. at 43, 103 S.Ct. at 2867. Our inquiry, though narrow, must be "searching and careful." Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971)).
 
 
 30
 2. Validity of the Regulation When Promulgated.
 
 
 31
 The plaintiffs' first contention is that the $1500 eligibility requirement was invalid when it was promulgated in 1982. Plaintiffs offer three reasons for their position: (1) that the data of a 1979 food stamp survey relied upon by the Secretary did not apply to AFDC recipients; (2) that the 1979 survey was missing key data; and (3) that the Secretary did not respond properly to public commentary on the regulation. These arguments do not convince us.
 
 
 32
 a. Food Stamp Survey Applied to AFDC Population.
 
 
 33
 The Secretary based the $1500 equity limit almost exclusively on a 1979 survey of food-stamp recipients contained in a 1981 report submitted to Congress.[2] Plaintiffs argue that using the 1979 survey to determine the AFDC automobile equity limit led to the adoption of an arbitrary and capricious rule. According to the plaintiffs, the data about food-stamp recipients is not applicable to the AFDC program. Plaintiffs further contend that the Secretary never offered any evidence to show that there was an overlap between the AFDC and food-stamp recipient populations.
 
 
 34
 To be sure, the Secretary could have used data on AFDC families rather than food-stamp recipients. And the Secretary could have drawn a better connection between the data he used and the final rule. But we do not review for a perfect or ideal rule-making process. We look instead to whether the Secretary has acted reasonably, and we think he did. See Brown, 46 F.3d at 109.
 
 
 35
 After announcing the final rule on the automobile equity limit, the Secretary stated that HHS
 
 
 36
 chose $1,500 as the maximum equity value for an automobile on the basis of a Spring 1979 survey of food stamp recipients. Data from that survey suggest that 96 percent of all food stamp recipients who own cars had equity value in them of $1,500 or less. In that the Federal maximum limit should be set within the range of the vast majority of current recipients and given that the food stamp population tends to be, on the average, more affluent than AFDC recipients, this limit appears reasonable and supportable.
 
 
 37
 47 Fed.Reg. 5657 (1982).
 
 
 38
 The district court, referring to a declaration of Paul Bordes, a director of research at HHS, found that there was a "substantial overlap" between the AFDC and food-stamp recipient populations-80% in 1979 and 87% today. Those figures, which other courts also have cited, reflect the number of AFDC recipients who also receive food stamps. See, e.g., Brown, 46 F.3d at 109. But those figures are not useful in evaluating whether a survey of food-stamp recipients is representative of the AFDC population. For that determination, we must know instead the percentage of food-stamp recipients who receive AFDC benefits. According to the Bordes declaration, that figure is much lower: 41% in 1993.
 
 
 39
 Even though the 1979 survey did not accurately reflect the conditions of AFDC families, the Secretary acted reasonably in relying upon it. First, according to the Bordes declaration, resource data on aid recipients was scarce in 1982. Second, according to Bordes, the non-AFDC food-stamp recipients included in the survey were, on average, more affluent. Therefore, the automobile equity limit was based on a population that was likely to have more expensive cars.
 
 
 40
 Plaintiffs challenge this conclusion, noting that the food-stamp program had an automobile equity limit of $4500 already in place when the survey was done, unlike the AFDC program at the time. They argue that the limit may have been higher if it had been derived from data of AFDC recipients alone. But as the Sixth Circuit noted in Hazard, "the 1979 vehicle asset limitation for food stamp recipients excluded only a small percentage of individuals who otherwise would have been eligible receive food stamps." 44 F.3d at 405. Therefore, the $4500 limit probably did not have a significant effect on the limit.[3]
 
 
 41
 The plaintiffs further argue that using the 1979 survey undermined a goal of the AFDC program: to allow individuals to be self-reliant and independent. We think it was reasonable for the Secretary to conclude from the 1979 survey that, in 1981, a $1500 auto equity limit would allow AFDC recipients to own functional cars. Other courts have agreed. See, e.g., Hazard, 44 F.3d at 405; Brown, 46 F.3d at 108-09; Champion, 33 F.3d at 966.[4]
 
 
 42
 b. Improper Data.
 
 
 43
 Plaintiffs also contend that the 1979 study relied on stale and incomplete data. Plaintiffs, however, offer no evidence for their theory that the three-year-old data was not sufficient to support the Secretary's finding that the overwhelming majority of food-stamp recipients owned automobiles with equity of $1500 or less in 1982.
 
 
 44
 More convincing is plaintiffs' claim that the data from the food-stamp survey is incomplete. Plaintiffs note that in the 1979 study about 35% of the recipients surveyed did not know the value of the equity they had in their automobiles. Therefore, in concluding that 96% of food-stamp recipients who owned automobiles had equity of $1500 or less, the Secretary must have assumed that the individuals who did not know the amount of equity in their automobiles mirrored that of the survey participants who did know the amount of equity they had. But there is no evidence in the record to support this assumption. The Secretary also included in the 96% figure people who did not own any cars at all.
 
 
 45
 Plaintiffs cite St. James Hosp. v. Heckler, 760 F.2d 1460, 1468 (7th Cir.1985), cert. denied, 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 228 (1985), for the proposition that an agency cannot rely on inadequate data when it makes a rule. While the data used by the Secretary in fashioning the $1500 limit may have been incomplete, the Secretary did not commit "a clear error of judgment" in relying on the incomplete data in setting the $1500 figure. Id. at 1468.
 
 
 46
 c. Secretary's Response to Public Comment.
 
 
 47
 Plaintiffs also claim that the equity limit was invalid when the Secretary adopted it in 1982 because the Secretary allegedly failed to respond adequately to criticisms of the figure during the rule-making process. The Secretary received numerous comments that criticized the $1500 equity limit. For example, the National Urban League commented that:
 
 
 48
 In setting this standard, the Secretary ignores at least one important factor, namely what minimum value is necessary to assure the ability to retain a car which is in good enough mechanical order to provide satisfactory and safe transportation without constant repair costs.
 
 
 49
 In response to all the comments, the Secretary stated:
 
 
 50
 We stand by our original position. The choice of $1,500 as the maximum equity value for an automobile was based on the data from a Spring 1979 survey of food stamp recipients. We regard the limit of $1,500 equity value in an automobile as reasonable and supportable.
 
 
 51
 47 Fed.Reg. at 5657. Plaintiffs contend that the Secretary's brief response to the comments violated the notice and comment provisions of the Administrative Procedure Act, 5 U.S.C. § 553(c).[5] We disagree.
 
 
 52
 An agency must state why the criticisms it received were invalid "where apparently significant information has been brought to its attention, or substantial issues of policy or gaps in its reasoning raised...." Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Comm'n, 547 F.2d 633, 646 (D.C.Cir.1976), rev'd on other grounds sub nom., Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). An agency must give a "reasoned response" in which the agency points to evidence in the record supporting its view. Id.; see also Kenneth Culp Davis & Richard J. Pierce, Jr., I Administrative Law Treatise 312 (1994) ("If a comment criticizes in detail some characteristic of the agency's proposed rule, and the agency retains that characteristic in the final rule without including in its statement of basis and purpose a relatively detailed response to that criticism, a reviewing court is likely to hold the rule unlawful on the grounds that ... the rule is arbitrary and capricious"). The agency bears the burden of showing that the regulations it formulates are well considered. See St. James Hosp., 760 F.2d at 1467 n. 5 ("[I]t is an agency's duty to establish the statistical validity of the evidence before it prior to reaching conclusions based on that evidence, not the public's duty to inform the agency of statistical invalidities in its evidence"). Commentators are not required to supply their own data to refute an agency's findings.
 
 
 53
 We, however, agree with the First Circuit's conclusion in Brown that "[g]iven the nature of the comments ... the Secretary's brief response [was not] so inadequate as to violate § 553(c)." 46 F.3d at 110. Indeed, only one dozen comments were submitted, and they were all brief and general. Id.
 
 
 54
 3. Failure to Adjust for Inflation.
 
 
 55
 Plaintiffs next contend that even if the Secretary properly set the $1500 equity limit in 1982, the figure is no longer reasonable as it fails to account for more than fourteen years of inflation. In support of their position, plaintiffs point out that $1500 in 1979 is the equivalent of $3242 in 1993, and that for the average urban household, the price of a used car more than doubled during that time period.[6] Further, $1,500 in 1992 represented just 9% of the average selling price of a new domestic car. Cars worth only $1500 are now between ten and fifteen years old and have more than 85,000 miles on them. Compared to newer cars, these cars are unreliable as well as more costly in terms of gas and repairs.[7] Based on these changed economic circumstances, we find that in 1996, there is " 'no rational connection between the facts found and the choice made' " by the Secretary in 1982. State Farm, 463 U.S. at 43, 103 S.Ct. at 2866 (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)).
 
 
 56
 Although many courts have noted that the $1500 automobile equity limit may be now unfair, see, e.g., Dist. Ct. Op. at 12-13, 14, 1993 WL 738386; Falin, 776 F.Supp. at 1101; Champion, 33 F.3d at 968, these courts have upheld the regulation because they found that the decision whether or not to adjust for inflation was within the Secretary's sole discretion. See, e.g., Falin, 776 F.Supp. at 1102; Champion, 33 F.3d at 967. However, whether the Secretary has properly exercised its discretion in not adjusting the automobile equity limit for inflation, depends on what Congress intended when it granted the Secretary the authority to establish the automobile equity limit.
 
 
 57
 This inquiry is complicated by the existence of two acts of Congress that pertain to the automobile equity limit. The first is the Social Security Act of 1935 which created the AFDC program and authorized the Secretary to administer it. See Pub.L. No. 94-271, 49 Stat. 627 (1935). Congress established AFDC to provide financial assistance
 
 
 58
 to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care....
 
 
 59
 42 U.S.C. § 601.
 
 
 60
 The second legislation relevant to congressional intent is the Omnibus Budget Reconciliation Act of 1981 ("OBRA"), which directed the Secretary to establish the AFDC automobile equity limit. Pub.L. No. 97-35 § 2302. The purpose of that statute was "to reduce federal spending." Minnesota v. Heckler, 739 F.2d 370, 375 (8th Cir.1984).
 
 
 61
 Some courts have found it proper for the Secretary to use the purpose behind OBRA as the primary indicator of congressional intent because OBRA was the statute that directed the Secretary to establish the automobile equity limit. See, e.g., Brown, 46 F.3d at 111; Falin, 776 F.Supp. at 1101. These courts hold that on the basis of OBRA alone, the Secretary's failure to account for inflation is reasonable because as inflation diminishes the value of $1500, fewer people are eligible for AFDC, and thus federal spending is reduced.
 
 
 62
 But this analysis is overly simplistic and not supported by the record. While it is true that the purpose of OBRA was to reduce spending, there is no evidence to suggest that Congress intended to cut spending progressively past 1981. Congress accomplished its goal of cutting costs when it reduced the resource limit from $2000 to $1000. There is also no indication in OBRA or its legislative history that Congress intended to use the automobile equity limit itself as a cost-cutting measure. Therefore, to discern Congress's intent, we must look beyond OBRA and consider the general purposes of the AFDC program. We must interpret a statute's provision in a way that is consistent with the policies of other provisions. See United Sav. Ass'n v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988) ("[s]tatutory construction ... is a holistic endeavor"). The position that we should focus primarily or exclusively on the cost-cutting purpose behind OBRA's amendments to AFDC and not on the general purpose of the AFDC program to foster "self-support and personal independence" for needy families runs afoul of this canon of statutory interpretation. To the extent that the Secretary can further both purposes-reduce federal spending for the AFDC program in 1981 and also encourage self-sufficiency and independence among AFDC recipients-that is the only course that effectuates Congress's multiple intentions. We believe that periodically adjusting the automobile equity limit for inflation is the only reasonable way to achieve Congress's competing goals.
 
 
 63
 Instead of following this course, the Secretary has ignored the general purpose of AFDC program and allowed the automobile equity limit to serve as a cost-cutting measure. Although Congress may have wanted to prevent AFDC recipients from having expensive cars-because before OBRA's passage there was no limit on automobile equity-Congress did not necessarily want to exclude from the AFDC program needy families that owned safe, functioning cars. We believe that by granting the Secretary the discretion to set the automobile equity limit Congress wanted to ensure that needy families would not be cut from the AFDC program simply because they owned automobiles. In fact, at oral argument, the Secretary conceded that it has never been the Secretary's position that the $1500 limit was set and not adjusted for inflation to make it more difficult for needy families to qualify for AFDC benefits.
 
 
 64
 Thus, allowing the automobile equity limit to be progressively diminished by inflation has rendered meaningless Congress's statutory purpose in recognizing the need for an automobile equity exception to the resource limit. Because inflation has lowered the value of the $1500 limit, functioning cars have increasingly cost more than $1500. As a result, more and more families have been disqualified from receiving AFDC benefits. Because the $1500 limit automatically eliminates otherwise eligible families from the AFDC program, the regulation is no longer reasonable and therefore is arbitrary and capricious.
 
 
 65
 Further, by failing to adjust the automobile equity limit for inflation the Secretary also has thwarted the reasoning that HHS itself advanced for the figure when it was established in 1982. The Secretary set the automobile equity limit at an amount that would not eliminate otherwise eligible families from the AFDC program. As the Secretary explained, "the Federal maximum limit should be set within the range of the vast majority of current recipients." 47 Fed.Reg. at 5657.
 
 
 66
 We should defer to the Secretary's interpretation of the purpose for the automobile equity limit. See Dioxin/Organochlorine Center v. Clarke, 57 F.3d 1517, 1525 (9th Cir.1995) ("[a] court should accept the 'reasonable' interpretation of a statute chosen by an administrative agency except when it is clearly contrary to the intent of Congress"). We believe that the Secretary reasonably interpreted Congress's purpose in establishing the automobile equity limit to be to preserve eligibility and not to cut costs.
 
 
 67
 In addition, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." State Farm, 463 U.S. at 50, 103 S.Ct. at 2870. The effect of more than fourteen years of inflation means that the Secretary's stated purpose no longer supports the $1500 limit and provides a separate basis to vacate the regulation.
 
 
 68
 The fact that there is no mandate in OBRA that the Secretary review the automobile equity limit and adjust it for inflation is not dispositive. We are reluctant to read any meaning into Congress's silence on the issue of whether periodic review of the effects of inflation on the automobile equity limit is necessary. We have recognized that an agency "is obligated to reevaluate its policies when circumstances affecting its rule-making proceedings change." See California v. FCC, 905 F.2d 1217, 1230 (9th Cir.1990). Even if that were not so, when, as here, a regulation's rationality depends on economic conditions, periodic review is essential.
 
 
 69
 The Secretary responds that Congress did revisit the automobile equity limit and decided not to adjust it for inflation. In 1987, Congress considered a proposal for experiments in a few states to explore using the $4500 food stamp automobile equity exemption for AFDC families. But the resulting 1987 OBRA did not contain such a provision. See Pub.L. No. 100-203, 101 Stat. 1330 (1987). Again in 1988, Congress considered the proposal, but made no change to the $1500 limit. Instead, a conference committee directed the Secretary to revise the regulation "if he determines revision would be appropriate." H.R. Conf. Rep. No. 998, 100th Cong., 2nd Sess. 188-89, reprinted in, 1988 U.S.C.C.A.N. at (102 Stat.) 2776, 2977. The Secretary conducted a review, but did not change the regulation. See Champion, 33 F.3d at 967.
 
 
 70
 Other circuits have interpreted this inaction to mean that inflation adjustments are not necessary under OBRA. See Brown, 46 F.3d at 111-12; Champion, 33 F.3d at 967. We, however, do not. The Supreme Court instructs us that inaction by Congress "lacks persuasive significance." Brown v. Gardner, --- U.S. ----, ----, 115 S.Ct. 552, 557, 130 L.Ed.2d 462 (1994) (quoting Central Bank of Denver, N.A. v. First Interstate Bank of Denver, --- U.S. ----, ----, 114 S.Ct. 1439, 1453, 128 L.Ed.2d 119 (1994)). Thus, the decision by Congress not to increase the $1500 limit does not change our view that the Secretary's failure to adjust the $1500 automobile equity limit for inflation has rendered the regulation unreasonable.
 
 
 71
 We also note that the Secretary has allowed various states to waive the $1500 limit and set a higher automobile equity limit. Apparently, California has raised the automobile equity limit to $4500, while Virginia and Colorado, among others, exempt one vehicle entirely regardless of its value. Such waivers are not only a recognition that in many states the $1500 limit is unreasonable but, more importantly, are consistent with this court's view that the purpose of the automobile equity limit is not to reduce federal spending but to ensure that eligible families are not excluded from the AFDC program simply because they own a reliable car.
 
 
 72
 C. Motion to Strike.
 
 
 73
 We review evidentiary decisions for an abuse of discretion and will generally not reverse absent some showing of prejudice. McGonigle v. Combs, 968 F.2d 810, 818 n. 6 (9th Cir.1992), cert. dismissed, 506 U.S. 948, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992). In the district court, plaintiffs made an oral motion to strike the affidavits of Alan Yaffe and Diann Dawson, HHS employees, because, plaintiffs claimed, the statements did not comply with F.R.C.P. 56(e) for various reasons. The district court did not rule explicitly on the motion, but did refer to the declarations and did rely on them in its order granting the Secretary's motion for summary judgment.
 
 
 74
 Even if the affidavits were improper, any resulting error was likely to be harmless. The district court engaged in a lengthy analysis of the plaintiffs' claims and only referred to the affidavits at the end of its order, in making the point that Congress had considered raising the $1500 limit but did not. In light of the rest of the court's findings, that point was not necessary to the court's conclusion. We affirm the district court's ruling.
 
 
 75
 D. The Medicaid Claim.
 
 
 76
 1. Background.
 
 
 77
 The district court granted summary judgment on behalf of the plaintiffs on their claim that Hawaii's use of the AFDC auto equity exemption in calculating Medicaid eligibility is contrary to Haw.Rev.Stat. § 346-29. Winona Rubin, Director of the Hawaii Department of Human Services ("DHS"), appeals.
 
 
 78
 When DHS calculates whether an applicant is eligible for Medicaid, it exempts some assets from consideration. There are essentially two types of Medicaid coverage: categorical coverage, which is given automatically to recipients of AFDC and Supplemental Security Income ("SSI"), and "medically needy" coverage which provides medical benefits to those who cannot pay their medical bills, but who have extra income that disqualifies them from the other benefit programs.
 
 
 79
 In Hawaii, the resource limits for categorical Medicaid are the same as the limits for the federal SSI program. H.R.S. § 346-29(4)-(5). The Hawaii program for "medically-needy" Medicaid for families with dependent children uses the AFDC auto equity exemption of $1500. However, the State applies a more generous auto equity exemption regulation to applicants for "medically-needy" Medicaid who are aged, blind or disabled and who qualify for medical assistance. Plaintiffs argue, and the district court agreed, that Haw.Rev.Stat. § 346-29 requires DHS to use SSI resource standards in all Medicaid programs, including "medically-needy" Medicaid for families with dependent children.
 
 
 80
 2. Eleventh Amendment.
 
 
 81
 As a threshold matter, Rubin argues that she is immune from suit under the Eleventh Amendment. Whether there is immunity from suit under the Eleventh Amendment is a question of law we review de novo. Harrison v. Hickel, 6 F.3d 1347, 1352 (9th Cir.1993). The district court did not address Rubin's Eleventh Amendment defense.
 
 
 82
 The Eleventh Amendment, as interpreted, generally acts to bar plaintiffs from suing state governments in federal court for violations of state law. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984). The Eleventh Amendment does not prevent federal court jurisdiction, however, when a state waives its immunity. Id. at 99, 104 S.Ct. at 907.
 
 
 83
 The plaintiffs argue that we have jurisdiction to decide the Medicaid claim because Hawaii waived its immunity.[8] Plaintiffs argue that Rubin waived Eleventh Amendment immunity by raising it only in her Answer (not at trial), by filing an affirmative claim against the Secretary in state court, and by filing a cross motion for summary judgment in federal court.
 
 
 84
 A court may not infer a waiver of immunity lightly. Rarely have courts found immunity waived absent an explicit waiver by the state or express language by Congress. See Edelman v. Jordan, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360-61, 39 L.Ed.2d 662 (1974); Atascadero State Hosp. et al. v. Scanlon, 473 U.S. 234, 238 n. 1, 105 S.Ct. 3142, 3145 n. 1, 87 L.Ed.2d 171 (1985). Recently, however, "the [Supreme] Court has ... recognized that Eleventh Amendment immunity ... may even be forfeited by the State's failure to assert it." ITSI TV Productions, Inc. v. Agricultural Ass'ns, 3 F.3d 1289, 1291 (9th Cir.1993) (discussing Blatchford v. Native Village of Noatak, 501 U.S. 775, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991)). In Blatchford, 501 U.S. at 785 n. 3, 111 S.Ct. at 2584 n. 3, the Supreme Court noted that in another case, Moe v. Confederated Salish and Kootenai Tribes, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), Montana had waived its immunity because it "had not objected in this Court on sovereign immunity grounds." But this glimmer of hope for the plaintiffs is unavailing because here Hawaii has objected "in this court on sovereign immunity grounds." That Hawaii did not raise the issue in the district court except in its answer does not amount to a waiver of immunity. See Edelman, 415 U.S. at 677-78, 94 S.Ct. at 1362-63.
 
 
 85
 In the face of this well-established rule that states cannot easily waive their immunity, Vargas v. Trainor, 508 F.2d 485, 491-92 (7th Cir.1974), cert. denied, 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975), does not provide the authority plaintiffs need to support their claim. The Seventh Circuit held that the Illinois Department of Public Aid waived its immunity when, in a memorandum to the court, it agreed to comply with the court's decision on the merits if the court did not grant an injunction against it pending appeal. The court found that: "A representation made in a judicial proceeding for the purpose of inducing the court to act or refrain from acting satisfies the [waiver] requirements...." Id. at 492. This case does not provide a sufficient basis on which to find a waiver. While Hawaii did ask the court to resolve certain issues in its cross motion for summary judgment, it did so to defend itself from suit. It did not, as did the defendant in Vargas, guarantee to the court that it would comply with its final judgment.
 
 
 86
 We therefore conclude that the Medicaid claim against Rubin is barred by the Eleventh Amendment. Accordingly, we reverse the district court's holding on this claim. Because this case was originally removed from state court, we direct the district court on remand to remand the Medicaid claim to Hawaii state court. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 351-53, 108 S.Ct. 614, 619-21, 98 L.Ed.2d 720 (1988).
 
 
 87
 E. Exhaustion of Administrative Remedies.
 
 
 88
 A final issue, not addressed by the parties, is whether the district court should have dismissed this action on its own motion because of plaintiffs' failure first to petition the Secretary for an amendment to the $1500 AFDC exemption. Generally, exhaustion is required under section 553(e) of the Administrative Procedure Act, which provides that "[e]ach agency shall give an interested person the right to petition for issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). See Brown, 46 F.3d at 113.
 
 
 89
 However, in a case involving the same issues raised by this appeal, the First Circuit held that "[w]hile petitioning the agency would have been the better course, ... strict adherence to the doctrine of administrative exhaustion" was not required. Brown, 46 F.3d at 113. We agree with the First Circuit that "[t]he doctrines of administrative exhaustion and primary jurisdiction are judge-made rules to be applied on a case-by-case basis." 46 F.3d at 114.
 
 
 90
 We will not require plaintiffs to petition the Secretary for a change in the $1500 automobile equity limit before deciding this appeal. At stake in this case are primarily issues of law, which courts are equipped to handle. Moreover, the Secretary has not objected to the lack of such a petition in this case. In fact, the Secretary has defended its failure to adjust the $1500 automobile equity exemption for inflation in several other circuits without raising the exhaustion issue. We find that in these circumstances requiring plaintiffs first to exhaust their administrative remedies would be futile and a waste of judicial resources. See Brown, 46 F.3d at 114-115.
 
 CONCLUSION
 
 91
 As set forth above, we affirm in part, reverse in part, and remand. First, we conclude that although the $1500 automobile equity limit was valid when first adopted it is no longer valid because the Secretary has failed to adjust this figure for inflation since its adoption almost fifteen years ago. We, therefore, reverse the district court's holding on this issue and vacate the $1500 automobile equity limit regulation. Second, we affirm the district court's denial of the plaintiffs' motion to strike certain affidavits from the record. Third, we reverse the district court's holding on the state law Medicaid claim. We conclude that Rubin is immune from suit under the Eleventh Amendment. However, because this action was filed originally in state court, we direct the district court on remand to remand the Medicaid claim to state court.
 
 
 92
 Costs awarded to Plaintiff-Appellant-Cross-Appellee Gamboa.
 
 
 93
 AFFIRMED IN PART, REVERSED IN PART, and REMANDED.
 
 
 94
 KOZINSKI, Circuit Judge, dissenting.
 
 
 95
 The majority does something truly remarkable: It holds that a regulation which was valid when adopted became invalid because it wasn't adjusted for inflation. There are many problems with this ruling, the most fundamental of which is that we have no jurisdiction to consider the issue. No action of the agency caused this regulation to lose its validity, but judicial review under the Administrative Procedure Act extends only to agency "action." See 5 U.S.C. § 702. The applicable substantive statute, moreover, gives us no standard against which to judge the legality of the agency's non-action, but the APA forbids judicial review unless there is a meaningful legal standard. See 5 U.S.C. § 701(a)(2); Heckler v. Chaney, 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985). Were the merits properly before us, we would have no choice but to uphold the regulation as a sensible application of what statutory guidance there is. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Finally, the majority not only raises a direct conflict with every other circuit that has considered the issue, see Brown v. Secretary of Health and Human Serv., 46 F.3d 102 (1st Cir.1995); Hazard v. Shalala, 44 F.3d 399 (6th Cir.1995); Champion v. Shalala, 33 F.3d 963 (8th Cir.1994); Falin v. Shalala, 6 F.3d 207 (4th Cir.1993) (per curiam), cert. denied, --- U.S. ----, 114 S.Ct. 1551, 128 L.Ed.2d 200 (1994), it actually overrules them by precluding the agency from applying the regulation even where the regional circuit has upheld it. Maj. op. at 1351 (vacating the regulation). Few opinions have taken us so far afield.
 
 Jurisdiction
 
 96
 The APA does not give us a roving commission to second-guess agency judgments; it is a limited grant of authority to review agency "action." In the run-of-the-mill APA case, the reviewable action isn't hard to find because the agency has formally adopted a regulation. See, e.g., Chevron, 467 U.S. at 840, 104 S.Ct. at 2780. Less commonly, an agency's refusal to adopt a regulation may amount to a reviewable action. For example, the APA allows interested parties to petition for rulemaking, see 5 U.S.C. § 553(e), and requires the agency to give an explanation if it denies the petition, see 5 U.S.C. § 555(e). Such a denial can be an action subject to judicial review. See American Horse Protection Ass'n v. Lyng, 812 F.2d 1, 4 (D.C.Cir.1987).
 
 
 97
 The rule of American Horse Protection Ass'n doesn't apply here, however, because plaintiffs never petitioned the agency for a change in the regulation.[1] Thus, the only agency action pertaining to the regulation was its initial adoption in 1982, which the majority holds was valid. Maj. op. at 1344-1346. It was only later--at a time the majority does not identify--that the regulation supposedly lost its validity. But there was nothing the agency did to cause this; rather, it was caused by macroeconomic forces which reduced the purchasing power of the dollar. But standing still in a changing world surely isn't the type of "action" that triggers judicial review under the APA.[2]
 
 
 98
 Plaintiffs' failure to petition the agency for a modification of the regulation is thus far more than a failure to exhaust; it is a jurisdictional defect because it denies us the irreducible minimum for APA review of agency action, namely, agency action.[3]
 
 
 99
 But there is a second jurisdictional problem: Were there agency action to review, we would have no legal yardstick by which to review it. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820-21, 28 L.Ed.2d 136 (1971).[4] According to the applicable statute, a family's eligibility for AFDC benefits must be determined by excluding from the calculation of resources "so much of [its] ownership interest in one automobile as does not exceed such amount as the Secretary may prescribe." 42 U.S.C. § 602(a)(7)(B) (emphasis added). As the First Circuit observed in rejecting an identical challenge to this regulation, there is a "total absence of any standards within the statute." Brown, 46 F.3d at 111.
 
 
 100
 The statutory language here is as vague as that in Chaney, where the Supreme Court held unreviewable the FDA's decision not to challenge states that used prescription drugs in lethal injections. See 21 U.S.C. § 372(a) ("The Secretary is authorized to conduct examinations and investigations"); 21 U.S.C. § 334 (offending food, drugs or cosmetics "shall be liable to be proceeded against" in seizure actions). The language is vaguer than that in Webster v. Doe, 486 U.S. 592, 600, 108 S.Ct. 2047, 2052, 100 L.Ed.2d 632 (1988), which held that the federal courts have no authority to review the Director of Central Intelligence's decision to fire an employee under 50 U.S.C. § 403(c) (termination authorized whenever the Director "shall deem such termination necessary or advisable in the interests of the United States"). The language here is as vague or vaguer than that in other cases holding that review was barred by section 701(a)(2). See, e.g., Flint v. United States, 906 F.2d 471, 474-76 (9th Cir.1990) (Secretary of Interior may enter into water-sale contracts "at such rates as in the Secretary's judgment will produce revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost and an appropriate share of such fixed charges as the Secretary deems proper"); State of Nevada v. Watkins, 914 F.2d 1545, 1563 (9th Cir.1990) (Secretary of Energy shall act "[i]f [he] at any time determines" that a location is unsuitable for use as a waste depository), cert. denied, 499 U.S. 906, 111 S.Ct. 1105, 113 L.Ed.2d 215 (1991); Slyper v. Attorney General, 827 F.2d 821, 823 (D.C.Cir.1987) (two-year waiting period shall be waived "upon the favorable recommendation of the Director of the United States Information Agency"), cert. denied sub nom., Slyper v. Meese, 485 U.S. 941, 108 S.Ct. 1121, 99 L.Ed.2d 281 (1988). The majority's attempt to review the regulation in the absence of a meaningful statutory standard thus conflicts with our own caselaw and that of other courts, including the Supreme Court.
 
 
 101
 The jurisdictional rules the majority discards are not hollow formalities; they are integral parts of the mechanism giving us authority to review agency action. Where these rules are followed, they set the stage for meaningful judicial review. Thus, when there is agency action, it is normally accompanied by a statement of reasons and an evidentiary record--two things sorely lacking here. See pp. 1356-1358 infra.[5] Moreover, a statutory standard enables the court to determine the rationality of the Secretary's action, as any action may be rational or not, depending on the standard by which it is measured. Here, there's no standard. As the First Circuit recognized in Brown, Congress gave "to the Secretary, and to no one else, the unqualified authority to prescribe the amount of the automobile resource exemption." 46 F.3d at 107.
 
 
 102
 Because there is no action to review, nor any standard by which to review it, that's the end of the case for me. We needn't speculate as to what might have animated the Secretary had she been asked to make a decision. Nevertheless, because the majority's rationale for striking down the regulation is so plainly wrong and so dangerous, I proceed to address the most obvious flaws in its analysis.[6]The Merits
 
 
 103
 The majority's analysis is a textbook illustration of why courts are ill-equipped to conduct judicial review in the absence of a meaningful statutory standard. Finding no law to apply, my colleagues plunge deep into questions of policy. Thus, they recognize that Congress intended to cut spending in 1981, but then take the curious view that the cost-cutting was not meant to continue past that year: "While it is true that the purpose of OBRA was to reduce spending, there is no evidence to suggest that Congress intended to cut spending progressively past 1981." Maj. op. at 1347. Nor, according to the majority, is there any "indication in OBRA or its legislative history that Congress intended to use the automobile equity limit itself as a cost-cutting measure." Id. Hunting for a limitation on the Secretary's authority that simply does not exist, the majority finds it necessary to balance OBRA's cost-cutting purpose with AFDC's purpose of "foster[ing] 'self-support and personal independence' for needy families." Id. Based on its own balancing of these two policy objectives, the majority concludes that "periodically adjusting the automobile equity limit for inflation is the only reasonable way to achieve Congress's competing goals." Id. (emphasis added).
 
 
 104
 Finding the bounds of rationality so narrowly circumscribed is certainly unusual. The statute itself contains no such requirement, even though Congress in 1981 was well aware of the effects of inflation. In 1981, Members of Congress--like everyone else--had lived through the runaway inflation of the Vietnam era, President Nixon's wage and price controls, President Ford's WIN (Whip Inflation Now) program, President Carter's "misery index" and interest rates in the 20% range. The erosion of purchasing power caused by years of double-digit inflation, and its effect on everyone, especially the poor, was headline news for some time prior to OBRA's enactment. See, e.g., Harry Anderson et al., The Gold Rush of '79, Newsweek, Oct. 1, 1979, at 48 ("According to most analysts, the U.S. economy is in--or at least on the brink of--a recession created as much as anything by a huge inflationary drain on consumer purchasing power."); Nancy L. Ross, Small Business Capital Investment Aid Proposed, Wash. Post, Feb. 11, 1978, at C12 ("Alan Greenspan, former chairman of the Council of Economic Advisors [warned that] [u]nless the purchasing power of the dollar can be stabilized [there could be] a massive run on the dollar by foreign holders, resulting in a rapid increase of interest rates around the world, and especially in this country."); A.F. Ehrbar, The Trouble With Stocks, Fortune, Aug. 1977, at 89 ("Inflation was a ... serious matter, as ... the reduction in the purchasing power of the dollar cut the real rate of return [on stocks from 7 percent] down to a meager 2.2 percent."); The Squeeze on the Middle Class, Business Week, Mar. 10, 1975, at 55 ("Over-all, the inflationary squeeze brought a 3.4% drop in last year's real per-capita disposable personal income--the first such drop since 1958. Obviously, the poor feel the tightest pinch.").
 
 
 105
 Members of the 97th Congress not only knew about inflation, they grappled with it. "Bracket-creep" may have little meaning to anyone who came of age in the 1980s and thereafter, but to those among us who paid income taxes in the '60s and '70s, the term has real bite. The reason for this generation gap is that the very same Congress that passed OBRA--within the space of a week--passed the Economic Recovery Tax Act of 1981. Compare 1981 U.S.C.C.A.N. 396 (OBRA passed both houses of Congress in final form by July 31, 1981) with 1981 U.S.C.C.A.N. 105 (ERTA passed both houses of Congress in final form by August 4, 1981). ERTA did away with bracket-creep by weaving inflation-indexing into the fabric of the Internal Revenue Code. As the House Conference Report accompanying ERTA explained:
 
 
 106
 Under present law, the individual income tax is based on various fixed amounts including the amounts that define the tax brackets, the zero bracket amount, and the personal exemption. These amounts are set by statute and are not adjusted for inflation. [The conference agreement is that] the income tax brackets, zero bracket amount, and personal exemption are adjusted for inflation (as measured by the Consumer Price Index), starting in 1985.
 
 
 107
 H.R. Conf. Rep. No. 215, 97th Cong., 1st Sess. (1981), reprinted in 1981 U.S.C.C.A.N. 285, 290.
 
 
 108
 Even as it passed OBRA, then, Congress was working on major legislation that contained an inflation adjustment mechanism. Over the years, Congress has passed several other such statutes, usually including indexing in the legislation, see, e.g., 7 U.S.C. § 2014(g)(2) (food stamp program vehicle exemption); 42 U.S.C. § 415(i) (Social Security benefits); 29 U.S.C. § 720(c) (vocational rehabilitation grants); 20 U.S.C. § 1087rr(b) (student aid); 20 U.S.C. § 2007 (stipends for federal scholarship recipients); 5 U.S.C. § 8340 (retired federal employees' annuities); 10 U.S.C. § 1401a (retired military personnel pay), but at least once directing an administrative agency to adjust benefits for inflation, 10 U.S.C. § 945(e) (retired military judges' annuities).
 
 
 109
 When it passed OBRA, therefore, Congress was well aware that federal programs based on fixed-dollar amounts would be affected by inflation, and it knew how to correct the problem. It could, for example, have directed the Secretary to set the automobile exemption at "such amount (periodically adjusted for inflation) as the Secretary may prescribe." Congress did no such thing; instead, it left the Secretary wide-open discretion to set and maintain the value of the exemption.
 
 
 110
 Congress again considered the automobile exemption in 1988. By then the exemption had been in effect six years, and its 1982 value had been reduced from $1,500 to approximately $ 1,270.[7] Still, Congress didn't adjust it for inflation or instruct the Secretary to do so; it expressed no unhappiness with the phenomenon that captures the majority's attention--erosion of the automobile exemption and consequential tightening of AFDC eligibility standards. In fact, Congress rejected a law that would have allowed five states to raise the automobile exemption to $4,500 and gave the Secretary a vote of confidence by instructing him to adjust the exemption amount only "if he determines revision would be appropriate." H.R. Conf. Rep. No. 998, 100th Cong., 2d Sess. (1988), reprinted in 1988 U.S.C.C.A.N. 2879, 2976-77.
 
 
 111
 Finally, less than three years ago, Congress decided to index the automobile exemption for Food Stamp benefits, see Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103-66, § 13923, 107 Stat. 312, 675 (codified as amended at 7 U.S.C. § 2014(g)(2)), but took no similar action as to the closely analogous exemption for AFDC benefits.
 
 
 112
 Erosion of the car exemption is thus not a mysterious phenomenon Congress was unaware of, could not anticipate and didn't know how to deal with. Indexing is a well-known and powerful tool for adjusting the burdens of inflation; whether to invoke it in a particular context is a hot-button policy issue with vast fiscal implications. It is precisely the kind of issue Congress should--and does--address directly. And here it has. The clearest proof that Congress meant for AFDC eligibility standards to gradually be raised by inflation is on the face of the statute. As our Sixth Circuit colleagues have observed, "OBRA itself cut in half the general limit on allowable resources under AFDC, and Congress has not adjusted that amount for inflation." Hazard, 44 F.3d at 404. Erosion of the basic asset limit ratchets up AFDC eligibility standards just like erosion of the automobile exemption: It makes it harder and harder for applicants who own property to qualify. Thus, the majority is plainly wrong when it finds "no evidence ... that Congress intended to cut [AFDC] spending progressively past 1981." Maj. op. at 1347.
 
 
 113
 The majority also seems to be saying that Congress's cost-cutting zeal was spent once it reduced the basic resource limit from $2,000 to $1,000, leaving no room for the Secretary to conduct further cost-cutting by reducing the automobile equity limit. Id. The statute, however, contains no such constraint on the Secretary's authority; the majority comes up with its conclusion only by weighing the law's competing policies. Id. But reconciling a statute's diverging policy objectives is the province of the agency charged with its administration. Chevron, 467 U.S. at 844-45, 104 S.Ct. at 2782-83. This is particularly so where hard choices must be made as to the allocation of scarce resources: "The distribution of public funds among competing social programs is an archetypically political task, involving the application of value judgments and predictions to innumerable alternatives." Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Donovan, 746 F.2d 855, 862 (D.C.Cir.1984) (Scalia, J.). By holding that the only rational judgment the Secretary could make under these circumstances is to inflation-proof the automobile exemption, the majority has assumed the prerogatives of the political branches.
 
 
 114
 Nor is the majority's ruling limited to this particular regulation. My colleagues go much farther by holding that periodic review and adjustment for inflation is required whenever "a regulation's rationality depends on economic conditions." Maj. op. at 1348. This reasoning affects all manner of regulations that set fixed-dollar amounts and are therefore subject to erosion by inflation. See, e.g., 20 C.F.R. § 416.1218(b)(2) (excluding up to $4,500 of market value of one automobile from resources of person applying for Supplemental Social Security Income); 20 C.F.R. § 416.1222(a) (excluding up to $6,000 of income-producing property from resources of person applying for Supplemental SSI); 20 C.F.R. § 404.1574(b) (establishing one fixed monthly earning limit for years 1979 to 1990 and another for years 1990 to present, for purposes of determining eligibility for SSI disability benefits); cf. Garnett v. Sullivan, 905 F.2d 778, 782-83 (4th Cir.1990) (rejecting argument that Secretary was required to adjust 20 C.F.R. § 404.1574's monthly earning limits for inflation).
 
 
 115
 Another in the smorgasbord of reasons the majority serves up in support of its conclusion is that "Congress did not necessarily want to exclude from the AFDC program needy families that owned safe, functioning cars," maj. op. at 1348, and "functioning cars have increasingly cost more than $1500," id. But Congress said nothing at all about what types of cars, if any, AFDC recipients should be allowed to own. The majority relies instead on vague assertions about the policy of encouraging "self-sufficiency and independence among AFDC recipients." Id. at 1347. But the weight to be accorded this policy is entrusted to the Secretary, who is given authority to set the automobile exemption at "such amount as [she] may prescribe." 42 U.S.C. § 602(a)(7)(B). If we are going to reject the Secretary's policy judgment, we must come up with some very persuasive reasons. Have we done so? Not even close. The majority notes that
 
 
 116
 $1500 in 1992 represented just 9% of the average selling price of a new domestic car. Cars worth only $1500 are now between ten and fifteen years old and have more than 85,000 miles on them. Compared to newer cars, these cars are unreliable as well as more costly in terms of gas and repairs.
 
 
 117
 Maj. op. at 1346. This is very interesting but largely beside the point. Of course older cars are more trouble than newer ones, which is usually why people who can, do buy new cars. But what does all this tell us about the self-sufficiency of AFDC recipients?
 
 
 118
 To make that determination, we must have reliable data about the economics of car ownership--just the type of data the Secretary develops during the course of administrative rulemaking. As the Secretary had no opportunity to develop such data, the majority relies entirely on an advocacy piece, suggestively titled "An Economic Investigation into the Basis for and Consequences of the H.H.S. Rule Eliminating from Eligibility for AFDC Benefits Families Who Have Over $1500 Equity in a Motor Vehicle." See Maj. op. at 1346-1347 & nn. 6-7. What assurance do we have that this "study" reflects reality? The author hasn't been qualified as an expert; his data haven't been subjected to peer review; he wasn't tested on cross-examination; there was no opportunity to consider competing views.[8] Yet, this is the only evidence the majority considers in vacating the regulation.[9]
 
 
 119
 In fact, the report contains patent flaws. To begin with, AFDC excludes $1,000 in assets, in addition to an automobile, a home and, at each state's option, items such as "clothes, furniture and other similarly essential items of limited value." 45 C.F.R. § 233.20(a)(3)(i)(B); see 42 U.S.C. § 602(a)(7)(B).[10] If a family has no unexcluded assets, it can assign this added value to its automobile, which means it can qualify for AFDC while owning outright a car worth up to $2,500. We have no idea whether some, many or most AFDC recipients are in this position since plaintiffs' report, and the majority, ignore this point altogether.[11]
 
 
 120
 The report and the majority also err in treating the $1,500 figure as if it were a limit on the total value of the car. See maj. op. at 1346-1347 & nn. 6-7(citing report). In fact, the regulation limits equity. 45 C.F.R. § 233.20(a)(3)(i)(B)(2). AFDC recipients can thus own cars worth anywhere from $3,000 (twice $1,500) to as much as $10,000 (four times $2,500) if they buy on credit. This opens up the question whether, and to what extent, AFDC recipients can obtain and service loans secured by their cars. The issue is not addressed by plaintiffs or considered by the majority.[12] In fact, it isn't something we could possibly judge for ourselves because it is the type of decision that calls for the Secretary's administrative resources and her exercise of policy judgment. What we know for sure, however, is that an analysis which treats equity value as if it were total value omits a key feature of the statutory scheme.[13]
 
 
 121
 Nor does the majority give the least thought to what other means of locomotion might be available to AFDC recipients.[14] Isn't it effete to assume that self-sufficiency and independence can only be found behind the wheel of a motor car? In fact, the federal government has poured tens of billions of dollars into public transportation, no doubt hoping people will abandon polluting, congestion-prone automobiles. See, e.g., Thomas C. Hayes, Dallas Negotiates Its Way Out of the Commuter Business, N.Y. Times, Feb. 2, 1986, at E5 (federal government has spent $43 billion on mass transit since 1964). The Secretary--if given a chance--might determine that AFDC recipients can get around well enough by means of heavily subsidized public transport, and should be discouraged from using AFDC dollars to buy and service cars.
 
 
 122
 The degree to which a car is a necessity, moreover, varies with local conditions. Residents of New York City and San Francisco are in a much different position than, say, those who live in Texas and Wyoming. Hawaii is unique: Not only is traffic a serious and growing problem there, see Susan Hooper, Steering Toward Solutions, Hawaii Business, Sept. 1989, § 1, at 16, but distances are short and automobiles are of limited use, as they can't be driven between many of the state's populated areas, or from Hawaii to anywhere else.[15]
 
 
 123
 Which brings me to the majority's last, and perhaps most troubling, rationale:
 
 
 124
 [T]he Secretary has allowed various states to waive the $1500 limit and set a higher automobile equity limit.... Such waivers are not only a recognition that in many states the $1500 limit is unreasonable but, more importantly, are consistent with this court's view that the purpose of the automobile equity limit is not to reduce federal spending but to ensure that eligible families are not excluded from the AFDC program simply because they own a reliable car.
 
 
 125
 Maj. op. at 1349. The logic of this argument escapes me. In 1962, Congress authorized the Secretary to grant waivers to a wide variety of AFDC program requirements on an experimental basis and for a limited time. See Public Welfare Amendments of 1962, Pub.L. No. 543, § 122, 76 Stat. 172 (codified at 42 U.S.C. § 1315). This enables the Secretary to "test out new ideas and ways of dealing with the problems of public welfare recipients." S.Rep. No. 1589, 87th Cong., 2d Sess. (1962), reprinted in 1962 U.S.C.C.A.N.1943, 1961. By drawing an adverse inference from the grant of such waivers, the majority impermissibly burdens the Secretary's discretion and undermines the policy of 42 U.S.C. § 1315. If the Secretary must worry that granting a temporary waiver will be construed by the federal courts as an admission that the requirement being waived is irrational, such waivers will be granted less freely. This will not only make it more difficult for states to tailor welfare programs to local conditions, it will undermine the congressional goal of "test[ing] new ideas and ways of dealing with the problem of public welfare recipients." S.Rep. No. 1589, 87th Cong., 2d Sess. (1962), reprinted in 1962 U.S.C.C.A.N.1943, 1961.
 
 The Remedy
 
 126
 The majority's ruling is extraordinary in one further respect. It doesn't merely prevent the Secretary from applying the $1,500 automobile resource limit in Hawaii or even the entire Ninth Circuit. No, it "vacate[s] the $1500 automobile equity limit regulation" altogether, maj. op. at 1351, with the stated consequence that all AFDC applicants will immediately qualify for benefits no matter how fancy a car they may own, at least until the Secretary can put a revised regulation into place, id. at 1343. The fiscal consequences of the majority's ruling would no doubt be substantial were its sweep confined to our own territorial jurisdiction, but the majority raises the stakes by giving its ruling nationwide scope. The majority thus not only creates a conflict with the four other circuits which have upheld the regulation, see p. 1351-1352 supra, it overrules their decisions by precluding the Secretary from enforcing the regulation even where the law of the local circuit allows it. Worse still, the majority holds that the Secretary may not set the automobile exemption at $1,500 no matter what justifications she comes up with, because any such amount would be "struck down ... as arbitrary and capricious." Maj. op. at 1343. We are thus in the unusual position of holding that an amount that four other circuits have upheld as rational is so irrational that it could not be upheld no matter what the justification.[16]
 
 
 127
 The majority could have ruled much more narrowly, of course, by merely adjudicating the denial of Gamboa's application for benefits. Such a ruling would have precluded the Secretary from applying the regulation within the Ninth Circuit, as a matter of stare decisis, but would have left her free to apply the regulation elsewhere. This course would have given proper deference to those other circuits that have reached a contrary conclusion. The majority, instead, goes out of its way to nullify the considered judgments of our colleagues of co-ordinate authority.
 
 
 128
 Were the majority nevertheless bent on affording nationwide relief, it could still adopt a less drastic remedy. The majority holds that the Secretary's rationale for the regulation does not support retaining it without periodic adjustments for inflation. See maj. op. at 1347-1348. The more prudent remedy under such circumstances isn't to vacate the regulation forthwith; it is to remand so the agency can come up with adequate reasons for retaining the regulation, or commence rulemaking. See, e.g., American Horse Protection Ass'n, 812 F.2d at 7-8 (where "the Secretary has not presented a reasonable explanation of his failure to grant the rulemaking petition ... [he] ... must be given a reasonable opportunity to explain his decision or to institute a new rulemaking proceeding."); see also 3 Kenneth C. Davis & Richard J. Pierce, Jr., Administrative Law Treatise § 18.1, at 165 (3d ed.1994). Such a ruling would have the added virtue of avoiding an immediate collision with the decisions of our sister circuits, as the Secretary would remain free to apply the current regulation while she pondered her options on remand. Of course, since the majority has prejudged any effort by the Secretary to re-adopt the $1,500 automobile exemption under any rationale, this would only be a temporary reprieve. But it would at least allow other circuits to reconsider their decisions in light of our ruling, rather than having it foisted on them as if from above.
 
 
 129
 * * *
 
 
 130
 My colleagues review an action that is not an action by applying a standard that is not a standard. They rush in where other circuits fear to tread, putting us first among equals. They adopt a rationale with explosive potential, one that applies equally to every regulation setting fixed-dollar amounts subject to erosion by inflation. They implement a policy device--indexing--that Congress has guarded jealously and used only sparingly. And, at a time when the federal government regularly grinds to a standstill because of widespread concerns about excessive spending, my colleagues set in motion a legal flywheel that will substantially ratchet up expenditures nationwide for what is already a very expensive federal program. This is as egregious a case of judicial overreaching as I have seen in my years on the bench. I emphatically dissent.
 
 
 
 [1]
 Gamboa's Buick had an appraised value of $8635. Gamboa claims that he bought the car with money he borrowed from his uncle. DHS, however, refused to consider the loan because Gamboa's uncle was not on the title of the car as a lienholder
 
 
 [2]
 The report was entitled Assets of Low Income Households: New Findings on Food Stamp Participants and Nonparticipants, Report to the Congress, January 1981, Food and Nutrition Service, U.S. Department of Agriculture
 
 
 [3]
 These excluded survey participants would have been significant to the Secretary's conclusion only in the unlikely case that many of them owned cars with equity in excess of $4500, but were still eligible for AFDC benefits
 
 
 [4]
 Plaintiffs' reliance on Maine Ass'n of Interdependent Neighborhoods v. Petit, 659 F.Supp. 1309 (D.Me.1987) is misplaced. Congress had directed the Secretary of HHS to exclude from a resource calculation the assets of potential recipients which were essential to self-support. The court invalidated the resulting federal regulation because it found that the Secretary had relied on a study that was logically flawed and provided no foundation for the regulation the Secretary adopted. Id. at 1322. The defects in the 1979 survey in the instant case are not as severe
 
 
 [5]
 5 U.S.C. § 553(c) provides that:
 After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments.... After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.
 
 
 [6]
 See Peter S. Fisher, Addendum to 1990 Report 1-2 (1993) at E.R. 104
 
 
 [7]
 See Peter S. Fisher, An Economic Investigation into the Basis for and Consequences of the H.H.S. Rule Eliminating from Eligibility for AFDC Benefits Families who have over $1500 Equity on a Motor Vehicle 1-20 (1990) at E.R. 81; Peter S. Fisher, Addendum to 1990 Report 3, 8-9 (1993) at E.R. 104
 
 
 [8]
 The plaintiffs do not argue that we have jurisdiction over the Medicaid claim because it is pendant to the federal law claim and because they are suing Rubin in her individual capacity. We have found jurisdiction on this basis in the past. See Pena v. Gardner, 976 F.2d 469, 474 (9th Cir.1992) ("[T]he eleventh amendment will not bar pendent state claims ... against state officials acting in their individual capacities."). We do not pursue this possibility here because Rubin does not appear to have acted beyond the scope of her statutorily designated authority. See id. at 474 (T.G. Nelson, J., concurring); see also Pennhurst, 465 U.S. at 107-111, 104 S.Ct. at 911-14
 
 
 [1]
 Indeed, plaintiffs have expressly disclaimed any construction of the record that would find an implied petition for rulemaking. Plaintiffs-Appellants/Cross-Appellees' Reply/Answering Brief at 19
 
 
 [2]
 That the majority is reviewing a non-action is perhaps best illustrated by its anachronistic conclusion: "Based on these changed economic circumstances, we find that in 1996, there is no rational connection between the facts found and the choice made by the Secretary in 1982." Maj. op. at 1346-1347 (internal quotation marks omitted)
 
 
 [3]
 I also disagree with the majority that exhaustion here would have been futile. See nn. 5-6 infra
 
 
 [4]
 While there is a presumption favoring judicial review of agency action, there's a presumption against judicial review of an agency's failure to act. See Heckler v. Chaney, 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985). Accordingly, an agency's "refusal to institute rulemaking 'is to be overturned only in the rarest and most compelling of circumstances.' " Brown v. Secretary of Health and Human Serv., 46 F.3d 102, 110 (1st Cir.1995) (quoting American Horse Protection Ass'n, 812 F.2d at 5). Because the majority holds that the Secretary abused her discretion by failing to revise a regulation that was validly adopted, plaintiffs had to overcome the inertia of this presumption before the district court could review this aspect of the case. Yet, as I explain below, the statutory language contains no standard against which we can measure the Secretary's decision to set the automobile exclusion at any particular amount. There is thus nothing with which to overcome the presumption against judicial review
 
 
 [5]
 I thus disagree that exhaustion was unnecessary because "[a]t stake in this case are primarily issues of law, which courts are equipped to handle." Maj. op. at 1351. The Supreme Court has admonished that "courts ordinarily should not interfere with an agency until it has completed its action ... particularly ... where the function of the agency and the particular decision sought to be reviewed involve exercise of discretionary powers granted the agency by Congress, or require application of special expertise." McKart v. United States, 395 U.S. 185, 194, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969). A petition for rulemaking would have focused the Secretary's attention on plaintiffs' claim at the administrative level. Had she chosen not to grant the petition, the denial would have contained reasons and, quite possibly, supporting data we could now consider in conducting our review. See 2 Kenneth C. Davis & Richard J. Pierce, Jr., Administrative Law Treatise § 15.2, at 309 (3d ed.1994) ("judicial review of agency action can be hindered by failure to exhaust administrative remedies because the agency may not have an adequate opportunity to assemble and analyze relevant facts and to explain the basis for its action.")
 
 
 [6]
 Normally, of course, we would be reviewing the Secretary's actual reasons for her action. Because the Secretary here was given no opportunity to consider the matter administratively, we are cut adrift, having to invent reasons why the Secretary might or might not have acted. For example, the majority observes that "at oral argument, the Secretary conceded that it has never been the Secretary's position that the $1500 limit was set and not adjusted for inflation to make it more difficult for needy families to qualify for AFDC benefits." Maj. op. at 1348. This off-hand comment by counsel is at odds with the position taken by the Secretary in litigation. See Hazard, 44 F.3d at 404 ("The Secretary responds that inflation's effect of gradually tightening eligibility standards is consistent with congressional intent in enacting OBRA."). In any event, the Secretary may not have adopted this position because there has never been a rulemaking, during the course of which she could have developed and articulated reasons for changing the exemption amount or for refusing to do so. I therefore don't believe counsel's concession can bind the Secretary or foreclose our consideration of this or any other plausible reason the Secretary might have developed for her action
 
 
 [7]
 This figure is based on the increase in the CPI-U--the Consumer Price Index for All Urban Consumers--for used cars, which increased from a base of 100 in 1982 to a level of 118 in 1988. See Bureau of the Census, U.S. Dep't of Commerce, Statistical Abstract of the United States 1994, at 490 (114th ed.)
 
 
 [8]
 The report was authored by one Dr. Peter Fisher. All we know about him is that he received his doctorate in economics from the University of Wisconsin in 1978 and that he has published "a substantial number of articles in academic journals." ER 102. Dr. Fisher was retained to prepare the study by Pine Tree Legal Assistance, Inc., of Augusta, Maine, for the purpose of challenging the regulation now before us, in the case of We Who Care, Inc. v. Sullivan, 756 F.Supp. 42 (D.Me.1991) (striking down regulation), overruled by Brown v. Secretary of Health and Human Serv., 46 F.3d 102 (1st Cir.1995). We have held that an expert report prepared for litigation must be considered with skepticism. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir.1995)
 
 
 [9]
 The Secretary's failure to submit contrary data would ordinarily justify reliance on plaintiffs' data at summary judgment. This isn't the case here, however, as plaintiffs have short-circuited the process whereby the Secretary could have been expected to develop contrary data. See nn. 5-6 supra
 
 
 [10]
 AFDC also excludes one burial plot and bona fide funeral agreements for each family member. 45 C.F.R. § 233.20(a)(3)(i)(B)(3) & (4). In addition, AFDC excludes for a period of six consecutive months real property the family is making a good faith effort to sell, provided that the family signs an agreement to dispose of the property and to repay aid to which the family would not have been entitled had the property been sold at the beginning of the period (with repayment not to exceed the net proceeds of the sale). 45 C.F.R. § 233.20(a)(3)(i)(B)(5)
 
 
 [11]
 Dr. Fisher's report contains tables demonstrating that you can get an automobile up to three years newer by adding $1,000 to the purchase price. See ER 99, 112. His discussion, like the majority's, ignores this inconvenient fact. Compare maj. op. at 1346-1347 with ER 99, 112
 
 
 [12]
 My colleagues are mistaken if they assume that anyone who qualifies for AFDC cannot possibly be driving a car bought on credit. To begin with, there are those who qualify for AFDC for short periods, but are not permanent residents on the welfare rolls. Two examples are mentioned in Dr. Fisher's report: a family where one spouse is recently divorced or widowed, or where both adults are suddenly unemployed, perhaps because of layoffs. ER 97. Such families may have qualified for a car loan before they got into financial straits and would only need to keep up payments after they became eligible for AFDC. Also, families may qualify for a variety of social welfare benefits--federal, state and local--over and above AFDC. AFDC recipients thus may have a far more positive financial picture (making them more credit-worthy) than would appear if one were to consider only what they receive under AFDC. See Michael Tanner et al., The Work vs. Welfare Trade-Off 5 (Cato Institute Policy Analysis Series No. 240 1995). The availability of such other assistance varies from state to state but, ironically, Hawaii is at the very top of the list in terms of available assistance: A typical AFDC family in Hawaii can get yearly assistance equivalent to a salary of $36,400, in addition to assistance available at the local level. Id. at 25. Owning a car bought on credit may be common among AFDC families. We don't know and have no way to find out
 
 
 [13]
 Dr. Fisher sidesteps the issue by assuming AFDC recipients own their cars outright. ER 97-98, 113. He offers no support for this assumption, except a brief reference to the fact that, when "considering the situation of a woman recently divorced or widowed, or a couple with both adults unemployed ... [one can assume] it is probably common to own a decent car outright." ER 97. Such guesswork strikes me as an extraordinarily thin basis on which to ignore a key term of the statute, and poor science to boot
 
 
 [14]
 Dr. Fisher's report implicitly recognizes that public transportation may afford many AFDC recipients a perfectly reasonable alternative to owning a car. ER 94, 106. But he chooses to focus instead on those recipients for whom the lack of a car may prove to be most problematic. Id. Thus, the report assumes, without argument or supporting authority, that a reasonable AFDC automobile exclusion "would permit ownership of an adequate car under the worst conditions prevailing in any state." ER 85 (emphasis added). In administering a nationwide program, the Secretary need not, of course, rely on the worst-case scenario in making her policy judgments
 
 
 [15]
 Once again raising the question of why Hawaii has Interstate Highways
 
 
 [16]
 There could be an interesting jurisprudential standoff if the Secretary were to deny benefits to an applicant in, say, Massachusetts based on the fact that the applicant owns a car with more than $1,500 equity value. Under one view of the matter, the applicant would win as a matter of res judicata, as he would be a member of the class in our lawsuit, which consists of all persons who have been or will be denied benefits because of their excess auto equity, CR 28, at 9. Under another view, the courts of the First Circuit might refuse to give effect to our ruling because it conflicts with their own circuit precedent, see Brown, 46 F.3d 102